1  Laurence D. King (SBN 206423)
2  **KAPLAN FOX & KILSHEIMER LLP**
   1999 Harrison Street, Suite 1560
3  Oakland, CA 94612
4  Telephone: (415) 772-4700
   Facsimile: (415) 772-4707
5  E-mail: lking@kaplanfox.com

6
7  *Attorneys for Plaintiffs*

8  [*Additional Counsel Appear on Signature Page*]

9          **UNITED STATES DISTRICT COURT**
10         **SOUTHERN DISTRICT OF CALIFORNIA**

11

12  ALEX LEE, INC.; BIG Y FOODS, INC.;          Case No.
    BROOKSHIRE BROTHERS, INC.;
13  BROOKSHIRE GROCERY COMPANY;
14  CERTCO, INC.; DOLLAR TREE
    DISTRIBUTION, INC.; GREENBRIER
15  INTERNATIONAL, INC.; FAMILY DOLLAR
16  STORES, INC.; FAMILY DOLLAR               **COMPLAINT FOR**
17  SERVICES, LLC.; THE GOLUB                 **VIOLATION**
    CORPORATION; KMART CORPORATION;           **OF THE SHERMAN ACT,**
18  K-VA-T FOOD STORES, INC.;                 **15 U.S.C. § 1**
19  MERCHANTS DISTRIBUTORS, LLC;
20  SCHNUCK MARKETS, INC.;                    **(Filed Under Seal)**

21                        Plaintiffs,          **HIGHLY**
22          vs.                                **CONFIDENTIAL**
                                               **INFORMATION**
23  LION CAPITAL LLP; LION CAPITAL            **SUBJECT TO**
24  (AMERICAS), INC.; and BIG CATCH          **PROTECTIVE ORDER**
    CAYMAN LP a/k/a LION/BIG CATCH           **OF THE COURT**
25  CAYMAN LP,
26                                            **DEMAND FOR JURY**
27                        Defendants.          **TRIAL**

28

Small Caps: COMPLAINT                                    Case No.

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    NATURE OF THE ACTION ................................................................ 1

II.    JURISDICTION AND VENUE ......................................................... 3

III.   PLAINTIFFS ..................................................................................... 5

IV.   DEFENDANTS .................................................................................. 7

V.    CO-CONSPIRATORS ....................................................................... 7

    A.   Bumble Bee ............................................................................ 7

    B.   Thai Union and Tri-Union .................................................... 8

    C.   Dongwon, Del Monte, And StarKist ................................... 12

VI.   AGENTS .......................................................................................... 21

VII.  INTERSTATE TRADE AND COMMERCE .................................... 22

VIII. FACTUAL ALLEGATIONS ........................................................... 22

    A.   Background ........................................................................... 22

    B.   The DOJ's Criminal Investigation ...................................... 26

    C.   Pattern of Collusion ............................................................ 27

    D.   Conspirators' Overarching and Continuous Collusive Scheme ........... 32

        1.   Collusion on Light Meat and White Meat Tuna Price Increases in 2004 and 2006 ........................................... 32

        2.   Collusion on Package Size Changes in 2007-08 .......... 40

        3.   Collusion on 2008 List Price Increases ....................... 46

        4.   Collusion on 2010 Net Price Increases ........................ 49

        5.   Collusion on 2011 Price Increases ............................... 52

        6.   Collusion on List Price Increases In 2011-12 .............. 55

7. Collusion on Offering "FAD Free" Branded Tuna Products ........58

8. Collusion on Promotional Activity ................................................59

IX. THE UNITED STATES PACKAGED SEAFOOD MARKET IS CONDUCIVE TO COLLUSION ................................................................60

X. PLAINTIFFS SUFFERED ANTITRUST INJURY ...................................61

XI. TOLLING OF THE STATUTE OF LIMITATIONS ...............................61

XII. ADDITIONAL ALLEGATIONS AGAINST DEFENDANTS LION CAPITAL, LION AMERICAS, AND BIG CATCH ..................................72

A. Additional Guilty Pleas ............................................................72

B. The Lion Entities ......................................................................73

C. Lion Directly Participated in the Conspiracy ...........................80

COUNT I: VIOLATION OF THE SHERMAN ACT § 1 .....................................98

PRAYER FOR RELIEF ..........................................................................99

JURY DEMAND .....................................................................................99

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiffs Alex Lee, Inc., Big Y Foods, Inc., Brookshire Brothers, Inc., Brookshire Grocery Company, Certco, Inc., Dollar Tree Distribution, Inc., Greenbrier International, Inc., Family Dollar Stores, Inc., Family Dollar Services, LLC, The Golub Corporation, Kmart Corporation, K-VA-T Food Stores, Inc., Merchants Distributors, LLC, Schnuck Markets, Inc. (collectively, "Plaintiffs"), by and through undersigned counsel, complain as follows:

## I.   **NATURE OF THE ACTION**

1.     This action arises out of an overarching, continuous conspiracy to fix, stabilize, or maintain the prices of shelf-stable packaged tuna products (*i.e.*, tuna in cans, pouches and ready-to-eat servings) ("Packaged Tuna") by Bumble Bee Foods LLC, Tri-Union Seafoods LLC d/b/a Chicken of the Sea, and StarKist Co. (along with certain other entities described below) (collectively, "Conspirators"). It began at a time uncertain, but at least by 2004, and continued in force or effect, or both, until at least July 2015. (the "Relevant Period").

2.     This conspiracy was effectuated by at least the following means: (a) agreeing to decrease the sizes of pouches and cans in which Packaged Tuna is sold; (b) agreeing to issue collusive price increases on Packaged Tuna; (c) agreeing to follow each other's price increases; (d) agreeing to limit promotional offers for Packaged Tuna; and (e) agreeing not to sell branded canned tuna labeled as caught without the use of fish aggregation devices (*i.e.*, that it is "FAD-free"). As a result of Conspirators' cartel, Plaintiffs have paid inflated prices for Conspirators' products.

3.     The United States Department of Justice ("DOJ") is conducting a criminal investigation of this conspiracy. On December 7, 2016, it filed a criminal information against Walter Scott Cameron, a Senior Vice-President of Sales for Bumble Bee, alleging a conspiracy to fix prices of packaged seafood, including Packaged Tuna. *United States v. Cameron*, No. 3:16-cr-00501-EMC (N.D. Cal.) (ECF No. 1). Cameron, who goes by the name "Scott" (and is referred to as Scott

Cameron throughout this Complaint), has held senior sales positions at Bumble Bee since May 2000 and has served as Bumble Bee's Senior Vice President of Sales since May 2007. As detailed below, Cameron entered into agreements with Chicken of the Sea and StarKist to increase prices. Cameron pled guilty on January 25, 2017.

4.      On December 21, 2016, the DOJ filed a criminal information against Kenneth Worsham, a Senior Vice President of Marketing for Bumble Bee, alleging his participation in a conspiracy to fix the prices of packaged seafood, including Packaged Tuna. *United States v. Worsham*, No. 3:16-cr-00535-EMC-1 (N.D. Cal.) (ECF NO. 1). Kenneth Worsham has been a Bumble Bee Senior Vice President of Marketing since at least 2001. Kenneth Worsham frequently discussed future pricing and shared customer opportunities with his father, Bob Worsham, a StarKist pricing consultant since the 1980s, as well as with Mike White, Chicken of the Sea's Director of Marketing since the late 1980s. As detailed below, Kenneth Worsham entered into agreements to increase prices with the leadership of Bumble Bee and StarKist. Kenneth Worsham pled guilty on March 15, 2017.

5.      Both plea agreements for Scott Cameron and Kenneth Worsham state that:

> [T]he defendant participated in a conspiracy with other persons and entities engaged in the manufacture and sale of packaged seafood, the primary purpose of which was to fix, raise and maintain the prices of packaged seafood sold in the United States. In furtherance of the conspiracy, the defendant engaged in conversations and discussions and attended meetings with representatives of other major packaged-seafood-producing firms. During these conversations, discussions and meetings, agreements and mutual understandings were reached to fix, raise and maintain the prices of packaged seafood sold in the United States.

Worsham Plea Agreement, ¶4(b); Cameron Plea Agreement, ¶4(b).

6.      Chicken of the Sea has confirmed that it is an amnesty applicant with respect to packaged seafood. Under the DOJ's Leniency Guidelines, for Chicken of

1    the Sea to receive conditional amnesty, the company must admit to its participation
2    in a criminal antitrust violation, such as price fixing. *See*
3    https://www.justice.gov/atr/page/file/926521/download.

4         7.     On May 8, 2017, Bumble Bee agreed to plead guilty and to pay a
5    criminal fine in the amount of no less than $25 million, and potentially as high as
6    $81.5 million, in connection with charges that it had fixed the prices of packaged
7    seafood, which was defined as consisting of shelf-stable tuna (*i.e.,* Packaged Tuna).
8    Specifically, the information filed by the DOJ stated that Bumble Bee had (a)
9    engaged in conversations and discussions and attended meetings with
10   representatives of other major packaged-seafood-producing firms; (b) agreed and
11   reached mutual understandings during these conversations, discussions and
12   meetings, to fix, raise, and maintain the prices of packaged seafood sold in the
13   United States; and (c) negotiated prices with customers and issued price
14   announcements for packaged seafood in accordance with the agreements and mutual
15   understandings reached. Bumble Bee has also agreed to cooperate in the DOJ's
16   ongoing investigation.

17        8.     This Complaint is filed under Section 4 of the Clayton Act (15 U.S.C.
18   § 15), to recover treble damages, costs of suit and reasonable attorneys' fees for
19   violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

20   **II.   <u>JURISDICTION AND VENUE</u>**

21        9.     The Court has original federal question jurisdiction over the Sherman
22   Act claim asserted in this Complaint pursuant to 28 U.S.C. §§ 1331 and 1337 and
23   Sections 4 of the Clayton Act (15 U.S.C. § 15).

24        10.    During the Relevant Period, Defendants, through their subsidiary
25   Bumble Bee, sold Packaged Tuna throughout the United States in a continuous and
26   uninterrupted flow of interstate commerce, including through and into this district.

27        11.    Defendants and their co-Conspirators engaged in conduct both inside
28   and outside the United States that caused direct, substantial, and reasonably

foreseeable and intended anticompetitive effects upon interstate commerce within the United States, and upon import trade and commerce with the United States.

12.   The conspiracy alleged in this Complaint has directly and substantially affected interstate commerce in that Defendants deprived Plaintiffs of the benefits of free and open competition in the purchase of Packaged Tuna within the United States.

13.   Venue is proper in this District pursuant to Sections 4(a) and 12 of the Clayton Act (15 U.S.C. §§ 15 and 22), and 28 U.S.C. § 1391(b), (c), and (d) because Defendants reside, transact business, are found within, or have agents within this District, and a substantial part of the events giving rise to Plaintiffs' claims occurred and a substantial portion of the affected interstate trade and commerce described below was carried out in this district.

14.   Defendants are amenable to service of process under Fed. R. Civ. P. 4(k)(1)(A) and the long-arm statute of California (Cal. Code Civ. P. §410) because each has transacted business in this state and because the California long-arm statute extends jurisdiction to the limits of due process and each Defendant has sufficient minimum contacts with the state of California to satisfy due process.

15.   This Court has personal jurisdiction over Defendants because, *inter alia,* each Defendant: (a) transacted business in this district, the United States and its territories, and the District of Columbia; (b) indirectly sold and delivered Packaged Tuna in this district, the United States and its territories, and the District of Columbia; (c) has substantial aggregate contacts with this district, the United States and its territories, and the District of Columbia; and (d) engaged in anticompetitive conduct that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District, the United States and its territories, and the District of Columbia.

### III.   **PLAINTIFFS**

16.     Plaintiffs Alex Lee, Inc. and its wholly-owned subsidiary, Merchants Distributors, LLC (together, "Alex Lee") are, respectively, a North Carolina corporation and a North Carolina limited liability company, with their principal places of business in Hickory, North Carolina. During the Relevant Period, Alex Lee purchased Packaged Tuna directly from one or more of the Defendants and was injured in its business or property by reason of the antitrust violations alleged in this Complaint.

17.     Plaintiff Big Y Foods, Inc. is a Massachusetts corporation with its principal place of business in Springfield, Massachusetts. During the Relevant Period, Big Y Foods, Inc. purchased Packaged Tuna directly from one or more of the Defendants and was injured in its business or property by reason of the antitrust violations alleged in this Complaint.

18.     Plaintiff Brookshire Brothers, Inc. is a Texas corporation with its principal place of business in Lufkin, Texas. During the Relevant Period, Brookshire Brothers, Inc. purchased Packaged Tuna directly from one or more of the Defendants and was injured in its business or property by reason of the antitrust violations alleged in this Complaint.

19.     Plaintiff Brookshire Grocery Company is a Texas corporation with its principal place of business in Tyler, Texas. During the Relevant Period, Brookshire Grocery Company purchased Packaged Tuna directly from one or more of the Defendants and was injured in its business or property by reason of the antitrust violations alleged in this Complaint.

20.     Plaintiff Certco, Inc. is a Wisconsin corporation with its principal place of business in Madison, Wisconsin. During the Relevant Period, Certco, Inc. purchased Packaged Tuna directly from one or more of the Defendants and was injured in its business or property by reason of the antitrust violations alleged in this Complaint.

---

21.     Plaintiff Dollar Tree Distribution, Inc., a wholly-owned subsidiary of Dollar Tree, Inc., is a Virginia corporation with its principal place of business in Chesapeake, Virginia.  During the Relevant Period, Dollar Tree Distribution, Inc. purchased Packaged Tuna directly from one or more of the Defendants and was injured in its business or property by reason of the antitrust violations alleged in this Complaint.

22.     Plaintiff Greenbrier International, Inc., a wholly-owned subsidiary of Dollar Tree, Inc., is a Delaware corporation with its principal place of business in Chesapeake, Virginia. During the Relevant Period, Greenbrier International, Inc. purchased Packaged Tuna directly from one or more of the Defendants and was injured in its business or property by reason of the antitrust violations alleged in this Complaint.

23.     Plaintiff Family Dollar Stores, Inc., a wholly-owned subsidiary of Dollar Tree, Inc., is a Delaware corporation with its principal place of business in Chesapeake, Virginia.  During the Relevant Period, Family Dollar Stores, Inc. purchased Packaged Tuna directly from one or more of the Defendants and was injured in its business or property by reason of the antitrust violations alleged in this Complaint.

24.     Plaintiff Family Dollar Services, LLC (formerly known as Family Dollar Services, Inc.), a wholly-owned subsidiary of Plaintiff Family Dollar Stores, Inc., is a North Carolina limited liability company with its principal place of business in Chesapeake, Virginia. During the Relevant Period, Family Dollar Services, LLC purchased Packaged Tuna directly from one or more of the Defendants and was injured in its business or property by reason of the antitrust violations alleged in this Complaint.

25.     Plaintiff The Golub Corporation, whose retail operating banners include Price Chopper and Market 32, is a Delaware corporation with its principal place of business in Schenectady, New York. During the Relevant Period, The

Golub Corporation purchased Packaged Tuna directly from one or more of the Defendants and was injured in its business or property by reason of the antitrust violations alleged in this Complaint.

26.    Plaintiff Kmart Corporation is a Michigan corporation with its principal place of business in Hoffman Estates, Illinois. During the Relevant Period, Kmart Corporation purchased Packaged Tuna directly from one or more of the Defendants and was injured in its business or property by reason of the antitrust violations alleged in this Complaint.

27.    Plaintiff K-VA-T Food Stores, Inc., doing business as Food City, is a Virginia corporation with its principal place of business in Abingdon, Virginia. During the Relevant Period, K-VA-T Food Stores, Inc. purchased Packaged Tuna directly from one or more of the Defendants and was injured in its business or property by reason of the antitrust violations alleged in this Complaint.

28.    Plaintiff Schnuck Markets, Inc. is a Missouri corporation with its principal place of business in St. Louis, Missouri. During the Relevant Period, Schnuck Markets, Inc. purchased Packaged Tuna directly from one or more of the Defendants and was injured in its business or property by reason of the antitrust violations alleged in this Complaint.

## IV.    DEFENDANTS

29.    Defendants Lion Capital LLP, Lion Capital (Americas), Inc., and Big Catch Cayman LP a/k/a Lion/Big Catch Cayman LP are described in detail in Paragraphs 279-333.

## V.    CO-CONSPIRATORS

### A.    Bumble Bee

30.    Bumble Bee Foods LLC ("Bumble Bee") is a domestic corporation with its principal place of business at 280 10th Avenue, San Diego, California 92101.  Bumble Bee produces and sells Packaged Tuna throughout the United States (including this District), its territories and the District of Columbia.  Bumble Bee

was a wholly-owned subsidiary of Defendant Lion Capital, a private investment firm headquartered in Great Britain.

**B.  Thai Union and Tri-Union**

31.  Tri-Union Seafoods, LLC d/b/a Chicken of the Sea International ("Tri-Union") is a Delaware limited liability company with its principal place of business at 9330 Scranton Road, Suite 500, San Diego, California 92121.

32.  Thai Union Group Public Company, Ltd. ("Thai Union"), a publicly held company headquartered in Thailand, is a global processor and exporter of frozen seafood and Packaged Tuna.

33.  Since 2000, Tri-Union has been a wholly-owned subsidiary of Thai Union North America, Inc. ("TUNAI"), a California corporation with its principal place of business at 9330 Scranton Road, Suite 500, San Diego, California 92121. TUNAI, in turn, is a wholly-owned subsidiary of Thai Union. All three vertically-integrated companies have been led by Thiraphong Chansiri, who serves as the CEO and President of Thai Union, the President of TUNAI, and a Director of Tri-Union, at which Chansiri has a day-to-day leadership role.

34.  Throughout the Relevant Period, Thai Union controlled and supervised the business, operations, and activities of Tri-Union, including the conduct alleged in this Complaint. Thai Union has been described in the media as "the world's biggest producer of canned tuna," and is reported to export approximately 55% of its tuna to the United States.

35.  Although it purchased half of Tri-Union in 1997, Thai Union did not gain full control of Tri-Union until Thai Union purchased Tri-Union's remaining shares in 2000. At that time, the then-Chair of Thai Union, Kraisorn Chansiri stated that the purchase would allow the two packaged seafood companies to "enhance information network for raw material procurement, sales and distribution." The acquisition was one of a string of takeovers of well-known Packaged Tuna manufacturers in recent years by Thai Union, which most recently aborted an

acquisition of rival Bumble Bee when it became clear that the deal would not likely be approved by the DOJ. These acquisitions are fully integrated into the Thailand-based conglomerate, which requires its most promising managerial candidates to work three to four years at its overseas subsidiaries. Thai Union strategy documents state a goal of "continu[ing] to integrate operations between group companies in order to save costs and strengthen our supply chain."

36.    Since the acquisition, Thai Union has fully integrated Tri-Union into its global Packaged Tuna business. In 2007, Tri-Union's President, John Signorino, was replaced by Thai Union's former Executive Director and Chief Financial Officer, Shue Wing Chan, who is both a member of the Chansiri family and Thai Union's self-styled "Global Leadership Team." Prior to joining Tri-Union, he served as the CFO of Thai Union.[1] During Chicken of the Sea "Meetings of Managers", Chan was identified as present both as the President of Chicken of the Sea (in which role he presided over the meetings) and as a Director of Thai Union. Chan, as alleged throughout this Complaint, actively participated in the collusive activities described on behalf of both Tri-Union and Thai Union.

37.    Tri-Union's board also has been and is dominated by Thai Union Group executives, including Thiraphong Chansiri and his father, Kraisorn Chansiri, who founded the conglomerate and co-chairs the board of Thai Union with Cheng Niruttinanon, who also serves as a Tri-Union director. For most of the Relevant Period, the Chansiri family owned approximately 25% of Thai Union, while the Niruttinanon family owned 7.5%. Tri-Union board meetings are held in Thailand, where its parent is located. Thai Union has also shifted portions of Tri-Union's

---

[1]     According to one report, as CFO of Thai Union, Shue Wing Chan "managed the [Thai Union] overall business development and financial operations, including day-to-day matters related to financial administration and business performance. He was responsible for managing the development and implementation of business plans and financial strategies for the expansion of [Thai Union's] business."

production from the U.S. to Thailand. In June 2016, Valentin Ramirez became Chief Executive Officer of Tri-Union, reporting directly to the Chair of the Board of TUNAI. At the same time, Shue Wing Chan left Tri-Union and assumed the position of the head of business development for TUNAI.

38.    During the Relevant Period, Thai Union exercised control over Tri-Union's business. Some examples are as follows. Thiraphong Chansiri oversaw the hiring of key executives for Tri-Union, including John Sawyer, a Senior Vice President of Sales who was central to many of the collusive events alleged in this Complaint. Chansiri approved Tri-Union's decision to enter into a Packaged Tuna co-packing agreement between it and Bumble Bee in 2011. The board of Tri-Union, which included several Thai Union executives, received and reviewed periodic "executive summaries" of Tri-Union's business affairs. Tri-Union facilitated Thai Union's efforts to sell frozen tuna loins to Bumble Bee.

39.    In addition to jointly held and attended "Management Meetings" and joint branding projects, Tri-Union and Thai Union frequently worked together in soliciting U.S. retail contracts. Sales presentations were often attended by both Thai Union and Tri-Union management and sales team members. The presentations highlighted the unique and vertically integrated relationship between the two entities.

40.    During the Relevant Period, Thai Union and Tri-Union were a single vertically integrated business enterprise, and Chicken of the Sea was considered a mere marketing brand as made clear in its investor presentations. As early as 2004, Thai Union and Tri-Union recognized that they functioned as one company. A brand strategy used by Tri-Union and Thai Union was "Thai Union + COTS = One Company."

41.    Although it was based in San Diego, Tri-Union conducted its board meetings in Thailand, in Thai Union's executive offices. Tri-Union incurred substantial costs to transport its California executives and board members to

Thailand for these meetings. In addition, Thai Union executives regularly attended the meetings of the "Managers of Tri-Union Seafoods, LLC" in San Diego. In March 2006, these "Managers" included Thai Union's Cheng Niruttianon (Thai Union Executive Director), Thiraphong Chansiri (President Thai Union), and Shue Wing Chan (then-Director Thai Union), all of whom attended a Manager's Meeting in San Diego. The meeting participants discussed such matters as price increases, costs, and marketing.

42.    As described herein, Thai Union approved Tri-Union's participation in the 2008 collusive resizing of canned tuna. It was aware of and supported collusive price increases for Packaged Tuna. It was aware of and supported the 2012 agreement among Bumble Bee, Tri-Union and StarKist Company to refrain from labeling their respective brands of canned tuna as "FAD-free," *i.e.*, caught in an environmentally friendly manner.

43.    Thai Union had its own warm relationships with Bumble Bee and StarKist, with whom it did business. For example, in April 2011, shortly after StarKist, Bumble Bee, and Chicken of the Sea had jointly raised Packaged Tuna prices, Thai Union's Thiraphong Chansiri reached out to StarKist's new President In-Soo Cho. Chansiri and Cho then met for a breakfast in early May in Brussels—where they were both attending a series of Packaged Tuna industry trade events—to discuss a possible joint venture.

44.    Thus, Tri-Union has been and is the *alter ego* and agent of Thai Union. Moreover, Thai Union directly participated in the conspiracy described herein through personnel who had duties at Thai Union, such as Chan.

45.    Thai Union also profited from the conspiracy. For each year between 2008 and 2015, Thai Union directed Tri-Union to disburse more than $100,000,000 of conspiracy proceeds that the subsidiary received to Thai Union in Thailand. As a result, Tri-Union is thinly capitalized. Tri-Union's stated equity as of December 31, 2012 was just $62 million. Approximately $24.6 million of the equity consisted of

Tri-Union's plant, property, and equipment. In addition, Tri-Union had over $63 million in related-party payables.

46.     Further, because of Thai Union's control, Chicken of the Sea was a captive purchaser of Thai Union's canned tuna and processed tuna loins, and Chicken of the Sea was forced to acquire the majority of the raw materials needed for its canned tuna at higher prices than it would have absent Thai Union's control, which resulted in the shift of profits from Chicken of the Sea to Thai Union.

47.     Thai Union and Tri-Union pitched themselves to Chicken of the Sea customers as one company, *i.e.*, Thai Union, the world's largest canned seafood company. Given the breadth and scope of the conspiracy, and the benefits received by Thai Union as a direct result of the collusion alleged herein, it would be inequitable to allow Thai Union to escape responsibility for the actions of the combined enterprise.

48.     As used herein, "Chicken of the Sea" collectively refers to Tri-Union and Thai Union.

### C.     Dongwon, Del Monte, And StarKist

49.     StarKist Co. is a Delaware corporation with its principal place of business at 225 North Shore Drive, Suite 400, Pittsburgh, Pennsylvania 15212. From December 2002 until October 2008, StarKist was an operating segment of Del Monte Corporation, at which time it was sold to three members of the family-owned and managed Korean chaebol Dongwon Group. The purchasing companies were Dongwon Industries Co., Ltd. ("Dongwon Industries"), Dongwon Enterprise Co., Ltd. ("Dongwon Enterprise"), and Dongwon F&B Co. After the purchase, StarKist became a majority-owned subsidiary of Dongwon Industries, and since September 23, 2012, StarKist has been a wholly-owned subsidiary of Dongwon Industries. Each of the Dongwon Group affiliates is ultimately owned by Dongwon Enterprise, a family-owned holding company. Jae-chul Kim, who founded the conglomerate in

1969, owns 24.5% of Dongwon Enterprise, while his son and successor, Nam-jung Kim, owns 68%.

50.    Del Monte Corporation ("Del Monte"), now known as Big Heart Pet Brands, Inc., is a Delaware corporation with its principal place of business at 1 Strawberry Lane, Orrville, Ohio, 44667. Del Monte acquired StarKist in 2002. Through StarKist, Del Monte produced and sold Packaged Tuna throughout the United States (including in this District), its territories and the District of Columbia. Del Monte sold StarKist to Dongwon on October 6, 2008. According to a filing by Del Monte with the Securities & Exchange Commission, "[a]t the time of sale, Del Monte entered into a two-year Operating Services Agreement (which was completed in September 2010) pursuant to which [Del Monte] provided operational services to Starkist Co. such as warehousing, distribution, transportation, sales, information technology and administration."

51.    Del Monte managed the operations of StarKist Co. during the time it owned StarKist, from December 2002 until October 2008, and thereafter continued to manage StarKist under an operating agreement with Dongwon Industries until October 2010, at which time Dongwon Industries became the operator of StarKist. Key StarKist executives also served as Del Monte executives during the time Del Monte owned and operated StarKist. For example, Don Binotto served as StarKist's CEO from the 1990s through December 2005 when StarKist was owned first by Heinz, then by Del Monte, and then was rehired by Dongwon Industries. Joseph Tuza was a Del Monte marketing executive between May 2006 and August 2008, and then was a StarKist Sr. VP of Marketing.

52.    Dongwon Industries Co., Ltd. is a publicly traded company with its principal place of business at Dongwon Industries Building, 7th Floor, Mabang-ro 68 (Yangjae-dong), Seocho-gu, Seoul, South Korea. Dongwon Industries is part of the Dongwon Group, which has annual Packaged Tuna revenue of approximately $1.4 billion. Dongwon Group is a chaebol, a family-controlled Korean

conglomerate, in which corporate lines between member entities are often blurred. StarKist regularly describes itself as a subsidiary of Dongwon Group and as a subsidiary of Dongwon Industries.

53.     Chaebols are closely-knit business groups in South Korea under the control of an extended family, with key flagship firms which are used as the instruments of control of other firms within the group. They have four key features: (1) the governance structure of the group involves family or extended family control; (2) the formal organizational structure of the group involves a group headquarters, located in an actual or *de facto* holding company, sometimes known as a "flagship" company, which controls a network of subsidiaries, which fall under the control of the family, the group as a whole, and of flagship firms within the group; (3) the business structure of the firm encompasses a number of discrete products and services, some of which are wholly unrelated and others that are effectively vertically integrated; and (4) these groups are characterized by strong internal cultures of hierarchy, familism, and loyalty, with family members of the founder or his cohorts also occupying key managerial positions within the group.

54.     The Dongwon Group is a Chaebol. The company started in 1969 and is dominated by Chair Jae-chul Kim ("J.C. Kim") and members of his family or extended family, as described in more detail below. The group is headquarters is in Seoul, South Korea, where its holding company, Dongwon Enterprise, is located. Through its subsidiaries, it operates in a number of business sectors including, among other things, marine products, other food products, feed products, and pet food, packing materials, and aluminum foil products. As explained below, the Dongwon family of companies has an internal culture of hierarchy, familism, and loyalty. Dongwon Industries and StarKist Co. exhibit that culture with members of J.C. Kim's family being placed in key positions in both companies and executives at Dongwon Enterprise, Dongwon Industries, and various other Dongwon subsidiaries being routinely seconded to StarKist Co. to fill managerial roles.

Dongwon Industries, run by J.C. Kim, is the parent entity for StarKist Co., but his control over the Dongwon Group was such that he could, with the stroke of the pen, command executives of the holding company or from sister subsidiary companies to either oversee the business of StarKist Co. from Korea or relocate in the United States and help run StarKist Co. In other words, as a chaebol, Dongwon does not follow the principles of corporate separateness that are expected of companies incorporated in the United States. Instead, the Dongwon entities, including Dongwon Industries and StarKist, operated as a single entity.

55.    Dongwon Group controls approximately 75% of the Korean canned tuna market. At the time of the StarKist acquisition, it was reported that "the transaction will help the Dongwon Group, whose affiliates include the world's biggest tuna fishing company, Dongwon Industries, and processed food maker Dongwon F&B, to create the world's biggest canned tuna business. 'We believe that the acquisition of StarKist seafood will help Dongwon establish a strong foothold and penetration in the U.S. market,' said Park In-gu, vice chairman of Dongwon Enterprise, which is the holding company for the conglomerate." Park also stated that the deal was "a great opportunity for us to initiate operations in the United States."

56.    Dongwon Group's website describes its mission to become the "world's biggest tuna company," through StarKist, which it describes as follows:

> StarKist is the world's best tuna brand with 65 years of history, and holds the No.1 position in the US tuna market. Like Dongwon Group in Korea, StarKist is an iconic tuna brand in the United States, and has been controlled by Dongwon Group since 2008, accompanying Dongwon Group on its journey to globalization. Dongwon Group, which has already become the dominant player in Korea's tuna market, has focused on the steady growth of the world's tuna market and determined that tuna can be one of core resources that will lead future industries. Through the acquisition of StarKist, Dongwon Group has secured an opportunity to take off as the world's biggest tuna

company, and will become de facto a globalized enterprise.

57.   Dongwon Group purchased StarKist with the goal of globalizing and integrating StarKist with its existing seafood businesses. According to former StarKist CEO, In-soo Cho, "StarKist used to own boats and catch its own tuna and process it and sell it" until the "business was sold and became part of larger parts of businesses." StarKist's purchase by Dongwon Group, which owns one of the largest fishing fleets in the world, was done with the goal of returning StarKist to an integrated business model, "from the sea to the shelves." To do so, executives from other Dongwon Group companies were brought to StarKist to oversee the company; the media reported a contemporaneous "string of exits" by StarKist's U.S. executives.

58.   On or around July 2, 2008, Chris Lischewski, Bumble Bee President and CEO sent Dongwon's Vice Chair Ingu Park a note of congratulations on Dongwon's upcoming purchase of StarKist. Park wrote back that "[w]e must cooperate as an industry to overcome these challenges we face. I hope to speak with you on my next visit to the U.S." As set forth below, Bumble Bee and StarKist continued to work together after Dongwon's purchase to keep prices in the Packaged Tuna market at collusive levels.[2]

59.   Dongwon Industries controlled and supervised the business, operations, and activities of StarKist, including the conduct alleged in this Complaint, from at least October 2008 to the present. At least as early as 2009, certain StarKist Board of Directors meetings were held in Korea, where Dongwon

---

[2]   Not long before Foll Park sent his note to Chris Lischewski, Dongwon already had blurred the line between industry cooperation and collusion. In 2011, the Korean Fair Trade Commission (KFTC) fined another Dongwon subsidiary, Dongwon Dairy Foods, 1.31 billion Korean won for conspiring to rig prices in the South Korean cheese market. The KFTC found that Dongwon Dairy employees had met with its competitors several times in 2007 and 2008 to rig cheese prices. Dongwon Dairy and its three co-conspirators controlled about 95% of that market.

executives could more easily participate. Dongwon also participated in weekly management calls with their StarKist team. As a Dongwon executive, Andrew Choe (now StarKist's CEO) received weekly reports about StarKist's market share. Choe was also a key member of the team to build a better supply chain for StarKist by leveraging Dongwon's global presence. StarKist President In-Soo Cho, handpicked by Dongwon to foster better synergy between StarKist and Dongwon, reported directly to Dongwon Chair J.C. Kim.

60.    In 2012, Dongwon Industries dismissed several StarKist executives and replaced them with executives from the Dongwon entities—a move intended to "better align and leverage Dongwon's expertise and streamline the organization." Among the Dongwon executives brought on to closely manage and control StarKist was Nam-jung Kim, who currently owns 68% of Dongwon Enterprise. Nam-jung Kim (the son of Dongwon Chair J.C. Kim) was appointed to the newly created position of chief operating officer to lead the "continued growth and expansion of Dongwon-StarKist global business." His biography, according to Bloomberg, demonstrates the seamless integration between the Dongwon affiliates, including StarKist:

> Nam-jung Kim served as Vice President of Dongwon F&B Co., Ltd. Mr. Kim served as the Chief Operating Officer of StarKist Co. since 2012 until October 2014. Mr. Kim's lasting relationship with the tuna industry took off in 1996 at the Dongwon F&B tuna plant in Changwon. He served as the Chief of Management Supporting Division at Dongwon Industry Co., Ltd. He served as a Director of Construction Division at Donwon Systems Corporation and Vice President of Dongwon Enterprise Co., Ltd. He became Product Manager of the sea laver category in 1999. Mr. Kim returned to Dongwon F&B in 2004 to work as Marketing Strategy Manager until 2006. He continued to diversify his business acumen by leading the Finance & Planning Department of Dongwon Industries Co. Since 2008, he served as the Head of the Finance and Planning Department at Dongwon Systems and served as its Vice President of its construction arm. Immediately before joining StarKist, he served as Executive Vice President at

Dongwon Enterprise since 2011, the holding company of the Dongwon conglomerate.

According to Bloomberg, Nam-jung Kim currently serves on the Board of Dongwon F&B, and as Vice Chair of StarKist.

61.    Nam-jung Kim was to lead the growth of the combined Dongwon-StarKist global business. At the same time, Dongwon Industries stated its commitment to supply StarKist directly with a steady stream of tuna, and purchased a dedicated vessel to operate for StarKist in American Somoa. Dongwon added Jae Hoon Choi to the StarKist procurement team to lead the effort.

62.    Also in 2012, Hyung-joo Kim was transferred from Dongwon F&B, where he served as chief financial officer, to become StarKist's senior vice president, finance. Andrew Choe joined Dongwon Enterprise in 2010 and was sent to StarKist in 2012 to work as senior vice president of supply chain and operations, before being named StarKist president and CEO in 2014. In addition, Ingu Park, the vice chair of Dongwon Enterprise, became the board chair of StarKist and served as interim president after Don Binotto left in November 2010, reporting directly to the Chair of Dongwon. According to Bloomberg, Ingu Park currently serves as both the CEO of Dongwon Precision Machinery Co. Ltd. and as Chair of the StarKist board of directors. He had previously served as Vice Chair and Director of Dongwon F&B.

63.    Dongwon micromanaged StarKist's affairs and disregarded principles of corporate separateness with respect to StarKist. For example, the job description for StarKist's President and CEO indicated that Dongwon Chair J.C. Kim was the "immediate supervisor" of the President and CEO of StarKist, notwithstanding the fact that J.C. Kim was neither on StarKist's board of directors nor an officer of StarKist itself.  Accordingly, StarKist's president reported to J.C. Kim regularly and sought approval on day-to-day matters related to StarKist's business, including the retention and employment terms of StarKist employees, the contract terms with StarKist's raw material suppliers, and whether to launch new products in the United

States. Additionally, Chair J.C. Kim directed StarKist on day-to-day matters, including by developing programs to increase production efficiency at StarKist's canning facilities, and coordinating StarKist's response to a lawsuit alleging that it underfilled cans, and controlled StarKist's communications with the FDA over health violations at its plants. StarKist's President and CEO was also required to provide J.C. Kim with a "CEO Monthly Report" that gave details on competitive information about Bumble Bee and Chicken of the Sea, which allowed Chair Kim to stay informed about the conspiracy agreements.

64.     While serving as Dongwon's Director of Strategic Planning (a position he held through March 2012), Andrew Choe also micromanaged the day-to-day affairs of StarKist and monitored StarKist's collusive efforts.  For example, while still a Dongwon executive, Andrew Choe helped lead a team of StarKist employees dedicated to improving StarKist's supply chain and a second team that was charged with developing new products for the U.S. market.  Andrew Choe also routinely provided direction to StarKist regarding its pricing and volume terms for specific customers. Also in 2011, Choe instructed a StarKist employee to obtain competitive information about the production status of a Thai Union tuna processing facility in Songkla, Thailand. The employee noted that he reached out to his Chicken of the Sea contacts to obtain the information sought by Choe.

65.     Dongwon's Andrew Choe studied the effects of the 2011 price increase closely and received from StarKist employees the collusive pricing agreed to by Bumble Bee and Chicken of the Sea, along with price increase letters from Bumble Bee and Chicken of the Sea that had been sent to StarKist surreptitiously, as described further below. Choe was assured the competitive environment was such that the higher prices would hold.

66.     Andrew Choe remained a Dongwon employee, with a Dongwon title and a Dongwon email address, until March 26, 2012, at which time he became a StarKist employee.  Choe nonetheless was so deeply involved in StarKist

management and strategy that as of the date of this Complaint, StarKist's own website describes Choe (StarKist's current CEO and President) as having joined StarKist in 2010. This demonstrates how blurred the distinction between StarKist and Dongwon management had become after Dongwon's purchase of StarKist.

67.     Dongwon, including J.C. Kim and other senior Dongwon executives, not only established policy and direction for StarKist, but was the decision-maker concerning even routine matters at StarKist, and effectively took over the performance of StarKist's day-to-day operations in carrying out that policy and direction.  Further, because of the disregard of corporate separateness and the lack of any meaningful distinction between the two companies, StarKist employees that performed acts in furtherance of the conspiracy did so on behalf of both Dongwon and StarKist (and Dongwon employees similarly acted on behalf of both StarKist and Dongwon).

68.     After Dongwon Industries acquired StarKist, the companies boasted to customers of the benefits of StarKist's alignment with a parent with seafood expertise, as well as of its vertically integrated model. It boasted to customers that the purchase allowed it to shift from a vertically integrated domestic manufacturer to becoming a global seafood brand.

69.      StarKist Co. is the agent, instrumentality and *alter ego* of Dongwon, which directly participated in, and profited from, the conspiracy described herein.

70.     Due to the unlawful conduct alleged in this Complaint, StarKist earned proceeds in excess of what it would have earned in a competitive market.  StarKist transferred this ill-gotten gain to its parent. According to its quarterly and annual reports, Dongwon typically derives more than 50% of its global revenue from the United States.

71.     Accordingly, Dongwon Industries knowingly profited from StarKist's participation in the conspiracy and knowingly accepted the proceeds of the conspiracy and has been unjustly enriched. For example, between 2011 and 2012,

The operating profits of Dongwon Industries and its subsidiaries increased from approximately 96.8 billion Korean Won (approx. USD $84 million) to 139.8 billion Korean Won (approx. USD $135 million). As a result of these facts, considered alone or in combination with one or more of the foregoing other facts, adherence to the fiction of the separate existence of Dongwon and StarKist would sanction a fraud or promote an injustice, and an inequitable result or an injustice would occur if the corporate form were elevated over substance

72.   As set forth below, Del Monte participated directly in various acts in furtherance of the conspiracy during the time it owned and operated StarKist. During the Del Monte years, StarKist functioned as an operating segment of Del Monte and was not an independent company. Multiple Del Monte employees served dual roles in both StarKist and Del Monte, including in their direct participation in the improper exchange of competitive information and illegal agreements. During its ownership, StarKist pricing presentations and price increase announcements were issued under Del Monte's corporate name and logo, and key conspirators acted under Del Monte titles and with Del Monte email accounts. For example, Bob Worsham, who on multiple occasions passed sensitive information to StarKist's competitors, had a Del Monte email account, and used it to send and receive internal StarKist email.

73.   As used herein, "StarKist" collectively refers to StarKist, Del Monte (December 2002 until October 2010), and Dongwon (from October 2008 through the present).

## VI.   **AGENTS**

74.   Defendants' alleged wrongful acts were authorized, ordered, or performed by their directors, officers, managers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

## VII.   <u>INTERSTATE TRADE AND COMMERCE</u>

75.   Defendants and their co-Conspirators, directly and through their affiliates, sold Packaged Tuna throughout the United States, including this district, at artificially inflated prices during the Relevant Period. Defendants and their co-Conspirators were direct competitors in the United States Packaged Tuna market.

76.   Throughout the Relevant Period, there was a continuous and uninterrupted flow of invoices for payment, payments, and other documents essential to the sale of Packaged Tuna in interstate commerce between and among offices of Defendants and their co-Conspirators and their customers located throughout the United States, its territories and the District of Columbia.

77.   Throughout the Relevant Period, Defendants, through Bumble Bee, transported substantial amounts of Packaged Tuna in a continuous and uninterrupted flow of interstate commerce throughout the United States, its territories and the District of Columbia.

78.   Throughout the Relevant Period, Defendants' unlawful activities, as described herein, took place within and substantially affected the flow of interstate commerce and had a direct, substantial and reasonably foreseeable effect upon commerce in the United States, its territories and the District of Columbia.

## VIII.   <u>FACTUAL ALLEGATIONS</u>

### A.   **Background**

79.   Packaged Tuna is composed of raw seafood processed to preserve and enhance flavor, and ensure product safety. Because it is typically caught far offshore, raw seafood is usually delivered to canneries frozen or refrigerated.

80.   Upon delivery to a processing plant, an initial quality control inspection is performed to ensure the seafood is stored and transported at the proper temperature, and is in acceptable condition. The seafood is maintained at temperatures ranging from 0°C to -18°C until processed. Seafood passing the initial quality control inspection is prepared for packaging.

81.    Accepted seafood is initially transferred to large ovens for "pre-cooking." After further cleaning, the seafood is fed into filling machines where product packages (either cans, pouches, or cups) are filled with pre-set amounts. Filled packages are moved to sealing machines where they are closed and sealed.

82.    Each package is affixed with a permanent production code identifying plant, product, date packed, batch, and other information. Filled and sealed packages are then cooked under pressure to make the products commercially sterile.

83.    StarKist, Bumble Bee, and Chicken of the Sea sell Packaged Tuna in the United States. The United States Packaged Tuna industry generates annual sales of approximately $1.7 billion.

84.    Conspirators dominated the United States market for Packaged Tuna throughout the Relevant Period, with a combined market share of 80-85%. Each Conspirator's share of the market is almost identical to what it was at the beginning of the Relevant Period: StarKist (40-44%); Bumble Bee (24-25%); and Chicken of the Sea (15-17%).

85.    After decades of growth, since 2004, demand for Packaged Tuna has been declining. From about 1950 until 2003, Packaged Tuna was the most popular seafood in the United States. In 1990, the International Trade Commission estimated that Americans consumed between one-half and two-thirds of the global supply of Packaged Tuna.

86.    Since the 1990s, health and sustainability concerns, which range from fears of mercury poisoning to fury over dolphin bycatch, have taken their toll. So, too, has a national dietary shift away from Packaged Tuna.

87.    As a result, domestic consumption of Packaged Tuna has steadily declined since 2004. Yet, as shown in Figure 1 below, which contains data through 2014 and projections thereafter, the prices, as represented by the spread between dollar sales and volume sales of Packaged Tuna, increased steadily from 2004 to 2014.

*Figure 1*



88.     In particular, Packaged Tuna saw a steady decline in U.S. per capita consumption between 2004 and 2014 (*see* Figure 2 below).

*Figure 2*

89.     In addition, the use of environmentally destructive methods of fishing, including purse seiners and fish aggregating devices ("FADs"), have led to an oversupply of skipjack. Skipjack accounts for the vast majority of tuna sold in the United States and is often described as "light tuna." The following chart, taken from the Western & Central Pacific Fisheries Commission's 2014 "Tuna Fishery

Yearbook" published in 2015 shows that annual global catches of skipjack increased between 1990 and 2014:

**_Figure 3_**



90.     Given the oversupply of raw tuna (the main ingredient in Packaged Tuna) and the decline in consumption of Packaged Tuna, one would expect rational businesses to reduce the prices of Packaged Tuna, but that did not happen. Instead, the Packaged Tuna prices paid by Plaintiffs to Bumble Bee, StarKist and Chicken of the Sea remained flat or declined from at least as early as 2001 until the collusive price increases in 2004 went into effect, at which time prices began to rise, and continued to rise throughout the duration of the conspiracy, and remained elevated well into at least 2015.

In a competitive environment, a decline in demand for a product will normally lead to a decline in the price of that product, all other things being equal. However, because Bumble Bee, StarKist, and Chicken of the Sea controlled the market and agreed with each other to fix the prices of Packaged Tuna, such prices were intentionally and collaboratively set at artificially high levels throughout the Relevant Period.

91.     The price increases since August 2004 were a direct result of the conspiracy to fix the prices of Packaged Tuna in the United States. As a result,

Plaintiffs paid artificially inflated prices for Packaged Tuna purchased from Bumble Bee, StarKist, and Chicken of the Sea.

### B.      The DOJ's Criminal Investigation

92.    On or around December 18, 2014, Thai Union announced that it intended to acquire Bumble Bee. However, regulatory proceedings concerning the proposed merger revealed Conspirators had engaged in an anticompetitive price-fixing conspiracy concerning packaged seafood, including Packaged Tuna.

93.    On July 23, 2015, Thai Union suspended the preferential public offering to fund its proposed acquisition of Bumble Bee in light of a criminal investigation commenced by the DOJ. Thai Union disclosed that both Bumble Bee and Chicken of the Sea had received grand jury subpoenas relating to an antitrust investigation of packaged seafood, including Packaged Tuna. The publication *Undercurrent News* reported that "Thai Union held a conference with analysts on the suspension of the share offer, in which the company's management said other US seafood producers have also received a subpoena requiring the production of relevant information to the DOJ."

94.    On December 3, 2015, the termination of the planned merger of Chicken of the Sea and Bumble Bee was announced. According to a DOJ press release:

> "Consumers are better off without this deal," said Assistant Attorney General Bill Baer [("Baer")] of the department's Antitrust Division. "Our investigation convinced us – and the parties knew or should have known from the get go – that the market is not functioning competitively today, and further consolidation would only make things worse."

95.    As noted above, Bumble Bee and two Bumble Bee executives have pled guilty to price-fixing Packaged Tuna, in violation of the Sherman Act.

## C.    Pattern of Collusion

96.    During the Relevant Period, the Packaged Tuna industry was rife with collusion, often stemming from the close interpersonal relationships that had developed over many years. Chicken of the Sea, Bumble Bee, and StarKist participated together in anticompetitive communications, including telephone calls (sometimes multiple times a day), text messages, emails (often using private email accounts to avoid detection), and frequent face-to-face meetings at pre-arranged locations, such as hotels and restaurants. In these meetings, emails, text messages and telephone calls, co-Conspirators shared sensitive business and bid information, and entered into agreements to fix, raise, stabilize, and maintain prices of Packaged Tuna sold in the United States. Among other things, they agreed not to charge below a certain price, and to coordinate price increases.

97.    Co-Conspirators had ample opportunities for collusion. Senior executives from Del Monte, StarKist, Bumble Bee, Chicken of the Sea, Dongwon, and Thai Union routinely attended trade shows and conferences during which they discussed Packaged Tuna pricing and other aspects of their anticompetitive conspiracy. Co-Conspirators regularly attended the multi-day biannual Infofish "tuna conference" — typically held in Bangkok, but never held in the United States (where there is more active antitrust enforcement) — as well as regular meetings of the International Seafood Sustainability Foundation ("ISSF") and its governing body, the International Seafood Sustainability Association. Co-Conspirators also collaborated on many projects during the Relevant Period, including their joint "Tuna the Wonderfish" advertising campaign, the National Fisheries Institute's ("NFI") Tuna Council (formerly known as the U.S. Tuna Foundation), and the collective efforts of the ISSF.

98.    Frequent international trade meetings provided opportunities for fostering warm relationships with competitors and ultimately facilitated high-level collusion. For example, when newly appointed StarKist President In-Soo Cho

attended an international tuna conference and ISSF/NFI meetings in Brussels in May 2011, he had breakfast meetings with Bumble Bee President and CEO Chris Lischewski on May 3, 2011 and Thai Union/Chicken of the Sea's Thiraphong Chansiri on May 4, 2011.

99.   Meetings hosted by the NFI and ISSF were typically limited to Conspirators' high-level executives, and perhaps one organizer from the trade associations. The organizers often had roots in the co-Conspirator companies. Susan Jackson, for example, participated in the NFI in the early years of the conspiracy on behalf of Del Monte, and attended collusive meetings held just before key price increases. She left Del Monte in late 2008 to take a leadership role in the ISSF, which then played a pivotal role in the conspiracy to restrict FAD-Free tuna products. Joe Clancy was a Chicken of the Sea executive from 2002 through December 2010, during which time he used his contacts at his former employer StarKist to collude about co-Conspirators' price increases. He left Chicken of the Sea for a position with the ISSF. These trade organizations were close-knit groups of executives and former colleagues that were used for collaborating closely on matters of mutual interest, often crossing the line from collaboration to collusion.

100.   For example, the NFI's "Tuna the Wonderfish" advertising campaign, which ran from early 2011 through early 2012, was designed to stem the tide of declining sales of Packaged Tuna in the United States. The "Tuna the Wonderfish" campaign gave co-Conspirators ample opportunities to conspire to raise and fix Packaged Tuna prices. Although the campaign was unsuccessful in boosting consumption, Defendants and co-Conspirators nonetheless jointly implemented price increases at least three times in 2011 and 2012 in the face of falling demand.

101.   There also were numerous interlocking relationships between Chicken of the Sea, Bumble Bee, and StarKist, which fostered frequent high-level discussions among the leadership of these companies. For example, between the late 1990s and 2009, StarKist and Chicken of the Sea had a co-packing agreement

concerning their facilities in American Samoa.

102.   During the Relevant Period, Bumble Bee and Chicken of the Sea also co-operated on seafood processing and packaging. Bumble Bee co-packed for Chicken of the Sea on the west coast at Bumble Bee's Santa Fe Springs, California plant, while Chicken of the Sea co-packed for Bumble Bee on the east coast at its Lyons, Georgia plant.

103.   During the Relevant Period, it was commonplace for former executives of one co-Conspirator to later become executives at their former competitors. Within the past 20 years, numerous individuals have held executive or senior sales/marketing positions for more than one Conspirator (while maintaining close interlocking relations with former colleagues), including, but not limited to:  Chris Lischewski (VP of Procurement at StarKist from 1991 to 1998, and then President and CEO of Bumble Bee, from 1999 to present); Jan Tharp (Sr. VP of Supply Chain at StarKist, from December 2008 to July 2010, Sr. VP, Operations at Bumble Bee, from July 2010 to September 2012, and then Executive VP/COO at Bumble Bee, from September 2012 to present); J. Douglas Hines (Sr. VP, Sales & Marketing at Chicken of the Sea in the 1990s, joining Bumble Bee in 1997, where he served as Bumble Bee's Executive VP and COO from September 2008 to September 2012); Joseph Clancy (VP Sales/Marketing at StarKist, from 1985 to 2002, and then VP Retail Sales at Chicken of the Sea, from November 2002 to December 2010); Kevin McClain (VP of Supply Chain at Chicken of the Sea, from 1979 to 2009, and then VP Resourcing at Bumble Bee, from 2009 to present); David Burt (General Manager – Marketing at StarKist from 2000 to 2004, and then VP Sales Specialty Markets at Bumble Bee, from March 2004 to present); Hubert Tucker (Sales Manager at Chicken of the Sea, from December 1997 to July 2012 and then Starkist's Director of Sales Eastern Zone, from July 2012 to present); Donald Stanton (General Manager Inventory Control at StarKist, from 1985 to 2001 and then VP Supply Chain at Bumble Bee, from October 2005 to January 2009); and Dennis Hixson (VP

Sales Specialty Markets at Chicken of the Sea, from 2005 to 2013, and then Sr. Retail Operations Manager at StarKist, from 2014 to present).

104.  The fluid movement of executives among Conspirators resulted in a web of personal and professional relationships that facilitated anticompetitive agreements and frequent exchanges of confidential and future price information.

105.  W. Scott Cameron, who recently pled guilty to price-fixing Packaged Tuna, has held senior sales positions at Bumble Bee since May 2000 and has served as Bumble Bee's Sr. VP of Sales since May 2007.  He frequently shared future pricing and customer information with the leadership of Chicken of the Sea and StarKist.  From October 2009 to September 2012, Cameron regularly communicated with Charles "Chuck" Handford, StarKist's VP of Trade Marketing, about future pricing and customer information, sometimes several times per day.

106.  During the Relevant Period, Cameron held frequent internal sales conference calls at Bumble Bee attended by numerous account managers. During these calls, he stated, inter alia, that he had been communicating with Chuck Handford of StarKist about future pricing for customers.

107.  During the Relevant Period, Bumble Bee's Cameron also spoke about future pricing with Frank Connelly, who was a Chicken of the Sea regional sales manager from at least 2000 until his death in April 2012.

108.  Chris Lischewski, President and CEO of Bumble Bee from 1999 to present, regularly had meetings at his office with Chicken of the Sea executives.  He also had discussions with StarKist executives by phone. Among others, Lischewski spoke frequently with Dennis Mussell Chicken of the Sea President and CEO prior to 2005, John Signorino, Chicken of the Sea President and CEO, from January 2005 to October 2007, Shue Wing Chan (Signorino's successor after October 2007), and Don Binotto of Del Monte/StarKist (StarKist CEO from the 1990s through November 2010) to agree on pricing and customers.  Lischewski and Kenneth Worsham, Sr. VP of Marketing at Bumble Bee since at least 2001, regularly

attended meetings with Chicken of the Sea and StarKist executives.   Lischewski attended meetings with competitors at least twice a year.

109.   During the Relevant Period, Kenneth Worsham, Bumble Bee's Sr. VP of Marketing since at least 2001, frequently discussed future pricing and shared customer opportunities with his father, Bob Worsham, a StarKist pricing consultant since the 1980s, and then shared StarKist's future pricing information with executives at Bumble Bee. Kenneth Worsham recently pled guilty to price-fixing Packaged Tuna.

110.   During the Relevant Period, Bumble Bee's Don George discussed future pricing with former Chicken of the Sea associates, including Mike White. Don George was Sr. VP of Trade Marketing and Innovation at Chicken of the Sea from June 1979 until May 2006, when he became VP of Trade Marketing at Bumble Bee.

111.   During the Relevant Period, Chicken of the Sea held weekly executive meetings on Fridays at 10:00 a.m. They were led by its CEO (John Signorino and later Shue Wing Chan), and attended by all department heads, including John Sawyer, Sr. VP Sales and Marketing, from 2006 until August 2013; Bob Blatt, CFO from the late 1990s to 2013; Jim Davet, Sr. VP Operations, from 2005 until 2008; Mike White, Director of Marketing since the late 1980s; and Kevin McClain, VP of Supply Chain until 2009.  At these meetings Sawyer, White, and Signorino/Chan discussed competitors' future price increases for Packaged Tuna products. On multiple occasions, Sawyer presented the group with StarKist's future price lists (described as "market intelligence"), which Sawyer received from StarKist.

112.   During the Relevant Period, Mike White, Chicken of the Sea's Director of Marketing since the late 1980s, regularly contacted his counterparts at StarKist (including Joseph Tuza, a Del Monte executive and StarKist Sr. VP of Marketing, from August 2008 until November 2011), and Bumble Bee to confirm price quotations that customers claimed to have received from his competitors.

### D.    Conspirators' Overarching and Continuous Collusive Scheme

113.   Conspirators' overarching and continuous scheme to fix prices for Packaged Tuna began at least as early as 2004, as demonstrated by the following specific examples:

#### 1.    Collusion on Light Meat and White Meat Tuna Price Increases in 2004 and 2006

114.    In the first half of 2004, the prevailing prices for canned tuna in the U.S. were below the level needed to deliver the profits expected by Thai Union. Conspirators cut the price of Packaged Tuna to gain market share. Indeed, for example, six-ounce chunk light tuna, which had sold for 63 cents a can in May 2003, had declined to 54 cents a can by late 2003 and early 2004, a decline of 14.3 percent. Chicken of the Sea was concerned that it had lost market share and that the pricing was not rational. Further, Chicken of the Sea executives believed Del Monte's StarKist was pursuing a goal of reducing the market from three main brands (StarKist, Chicken of the Sea, and Bumble Bee) to just two brands.

115.   COSI's then-CEO, Dennis Mussell, complained to Thai Union on March 18, 2004 that Chicken of the Sea was expected to experience a net loss for the time period, so irrationally low did Chicken of the Sea consider market prices for Packaged Tuna. COSI needed a new strategy.

116.   As early as 2003, Thai Union had encouraged more cooperation with Bumble Bee, to whom Thai Union sold tuna loins. In March 2004, Chicken of the Sea management discussed methods by which Bumble Bee and Del Monte's StarKist could be convinced to increase canned tuna prices in the United States. Thai Union and Tri-Union would both benefit from this strategy, because higher canned tuna prices accommodated higher prices for processed tuna sold by Thai Union to Chicken of the Sea and its rivals. (Processed tuna is the main cost input to produce canned tuna).

117.   As part of this new strategy, on May 4, 2004, Mussell instructed

Chicken of the Sea executives Mike White, Anthony Montoya, and Don George to put out feelers to Bumble Bee and Del Monte to determine whether there was support for a price increase. Ten days later, on May 14, 2004, Bumble Bee executive Kenneth Worsham, Senior Vice President of Marketing, who has now pled guilty to price-fixing, received a Chicken of the Sea internal price list, which upon information and belief came from one of the executives following Mussell's instruction. Kenneth Worsham, in turn, informed Bumble Bee's Daniel Gerlach, Vice President of Sales, that he had in advance the Chicken of the Sea price information. Gerlach asked to see it by e-mail or fax in order to save time. But Kenneth Worsham knew the illicit nature of the Chicken of the Sea pricing document, and evidencing consciousness of guilt, he instructed his assistant to "overnight to dan ... no faxes or e-mails." Gerlach replied "PARANOID!!!!"

118. During May 2004, Mussell was in close contact with Chris Lischewski, President and CEO of Bumble Bee, and Don Binotto, President and CEO of StarKist, then an operating segment of Del Monte, as they worked together on their presentations for the industry's major trade event (the InfoFish World Tuna Conference in Bangkok), the theme of which was the state of the U.S. tuna market. During late May 2004, these executives also communicated regularly about their planned reactions to new country-of-origin regulations that were soon to go into effect. Upon information and belief, Mussell, Binotto and Lischewski used these communications to discuss increasing prices of canned tuna in the United States.

119. As a result of the discussions among the Chicken of the Sea, Bumble Bee and Del Monte/StarKist executives and employees between March and May 2004, a conscious commitment to an unlawful common scheme, *i.e.*, an agreement, developed among co-Conspirators to increase prices of canned tuna sold to Plaintiffs and others in the U.S. by, among other conduct, coordinating price increase announcements or pricing terms, secretly and collusively exchanging pricing

information and prospective pricing announcements and business plans, and collectively reducing quantity and restraining output.

120.   As early as May 26, 2004, Chicken of the Sea was aware that Del Monte and Bumble Bee would announce canned tuna price increases that summer. By the early hours of May 31, 2004, before any Conspirator announced its price increase publicly, Chicken of the Sea's Dennis Mussell knew that the fix was in. Through email, he confirmed to Thai Union's Thiraphong Chansiri and others at Thai Union that StarKist and Bumble Bee would be significantly increasing prices by approximately 10%, on both light meat and white meat canned tuna products between June and September 2004.  Dennis Mussell explained to Thai Union that merely announcing price increases would be insufficient, given the expected pushback from retailers, and that implementing higher prices would require a unified effort among the Big 3, *i.e.,* Chicken of the Sea, Bumble Bee and Del Monte/StarKist.

121.   Mussell would not have told the Chicken of the Sea board on May 31, 2004 that Chicken of the Sea, Bumble Bee, and StarKist would raise prices of canned tuna significantly between June and September 2004, the approximate amount of the price increase, and that this would be a concerted effort among the Big 3 unless he knew by then that Chicken of the Sea, Bumble Bee and StarKist had, in fact, already agreed to increase prices of light meat and white meat tuna by the amounts and on the timetable that he told the Board that day.

122.   In support and confirmation of their unlawful agreement, and so its rival could conform its pricing plans accordingly, on or about June 2, 2004 (or possibly earlier), upon information and belief, Del Monte sent its non-public, highly confidential internal plans for pricing and marketing canned tuna to Chicken of the Sea.  Chicken of the Sea's Anthony Montoya, who received the documents, circulated it internally to Chicken of the Sea's Mike White and Don George in an email dated June 2, 2004 at 8:10 p.m. Montoya, who was among those whom Dennis

1   Mussell had earlier instructed to learn if Bumble Bee and Del Monte would support
2   a canned tuna price increase, knew that he had in his possession competitor pricing
3   documents that he should not have. Consequently, in his email to COSI's White and
4   George, COSI's Montoya emphasized to them, using capital letters: "PLEASE
5   PROTECT THIS INFORAMTION!!!!!!!" [sic].

6       123.  This Del Monte/StarKist document – extraordinary in that it was in
7   COSI's possession and what it revealed to Chicken of the Sea about StarKist –
8   provided a roadmap of StarKist's packaged seafood business and its plans going
9   forward. For example, the document described in detail such highly confidential,
10  commercially sensitive information, including forward looking information, as
11  StarKist's sales quantities of packaged seafood to its top 20 customers and how their
12  purchase volumes had changed; StarKist seafood shipments by segment; StarKist's
13  market share for specific canned tuna products; the duration of merchandising and
14  promotional support for StarKist's seafood products; StarKist's average unit selling
15  price compared with Bumble Bee and Chicken; an analysis of the price decline in
16  canned tuna for StarKist, COSI and Bumble Bee in December 2003; StarKist's fiscal
17  year 2005 financial objectives;[3] the specific per unit pricing that StarKist sought to
18  achieve in fiscal year 2005 for specific canned tuna products; StarKist's specific
19  marketing plans in fiscal year 2005 to grow tuna pouches, maintain StarKist's
20  market share for chunk light tuna and albacore, and the "need to get nets up behind
21  [the] 6/1/04 price increase." (Underline in original.)

22      124.  Pursuant to their agreement, all three brands, Chicken of the Sea,
23  Bumble Bee, and StarKist, increased their net prices on light and white meat
24  Packaged Tuna in June and July of 2004. This was followed by a list price increase
25  by each Conspirator that was announced in late August and early September of
26  2004. By September 2, 2004, Bumble Bee, StarKist, and Chicken of the Sea had all
27  collusively raised list prices on light meat Packaged Tuna by an additional $2.00 per

28

---

[3]        Del Monte's 2005 fiscal year began in June 2004.

case in accordance with their unlawful agreement to increase Packaged Tuna prices to Plaintiffs and others in the United States.

125. And as Mussell had promised, margins improved. Del Monte noted net sales had increased due to price increases, and by October 2004 Del Monte's CEO noted that recent price increases were being accepted by retailers and consumers – "Our pricing has been taken." Co-Conspirators' 2004 collusive price increases had the effect they intended of increasing U.S. canned tuna prices, and these prices remained at supracompetitive levels through 2005.

126. By mid-2005, Chicken of the Sea was triumphant. Looking back upon the past year, executives touted that they had gone from a loss to a profit, and boasted that their brand was no longer a target of attack by StarKist, which just a year earlier had pursued Chicken of the Sea's market share relentlessly. Everything had changed.

127. In or about January 2006, Conspirators decided to execute another round of collusive price increases when rising albacore costs threatened to erode their supracompetitive profit margins.  Del Monte soon answered the question as to who among the Big 3 would move first, as it started notifying the trade on or about January 30, 2006 that it would increase prices on white meat (albacore) tuna products by about 6% effective May 1, 2006. But Del Monte needed Bumble Bee and Chicken of the Sea to go along with the price increase for it to hold. If either did not, then Del Monte risked losing market share to one or both of them. Would Bumble Bee and Chicken of the Sea participate in the price increase?

128. Over the course of about the next two months, Kenneth Worsham and Scott Cameron of Bumble Bee communicated with their counterparts at Chicken of the Sea and Del Monte through a series of telephone calls, meetings, and surreptitious facsimiles to confirm that all three would support another conspiracy price increase and to coordinate the timing and amount of this increase.

129.   Beginning on January 16, 2006, Bumble Bee's Kenneth Worsham and Chicken of the Sea's Mike White talked by telephone about increasing canned tuna prices.

130.   Bumble Bee's Kenneth Worsham and Chicken of the Sea's Mike White spoke again about the canned tuna price increase on February 1, 2006 and February 3, 2006.

131.   By this point in time, and similar to the pattern in connection with the June 2004 conspiracy price increase, Bumble Bee's Scott Cameron had come into possession of at least two versions of a confidential Del Monte presentation deck titled "StarKist Seafood Price Increases" that stated StarKist's intention and detailed plans to increase prices on white meat tuna and maintain existing prices on light meat tuna (notwithstanding a drop in the price of skipjack that would have justified a price decrease on light meat tuna) effective on May 1, 2006.[4] As before, Del Monte wanted its competitor, this time Bumble Bee, to know Del Monte's pricing plans so Bumble Bee could plan accordingly.

132.   On February 3, 2006, armed with the Del Monte pricing plan, Bumble Bee's Scott Cameron took remarkably revealing action demonstrating consciousness of guilt as to his and Bumble Bee's participation in the unlawful conspiracy. That day, he snuck into the office of an acquaintance and co-tenant in their building to use his fax machine, rather than Cameron's own, to send pages of the "StarKist Seafood Price Increases" document to Chicken of the Sea's Mike White. The co-tenant did not work for Bumble Bee; in fact, he had no connection to the packaged seafood industry other than the fact that he rented office space in the

---

[4]   Bumble Bee did not produce any email indicating the source of the file either to the Grand Jury investigating Conspirators' misconduct or to Plaintiffs. Accordingly, on information and belief, A Bumble Bee employee either received the file in person on a portable storage device such as a flash drive, or the employee received the file via email and deleted the incoming email from the company's server.

same building in Shrewsbury, New Jersey as did Cameron.  The building (known as "Par Excellence") was not owned by Bumble Bee, and the co-tenant did not give Cameron permission to use his fax machine. Cameron went to these lengths to surreptitiously fax pages from the Del Monte presentation to White of Chicken of the Sea in a manner that did not leave a facsimile line on the paper revealing that it came from Bumble Bee. Cameron did this because he knew that he should not have had the StarKist pricing document, and he should not have been coordinating a Bumble Bee canned tuna price increase with Del Monte and Chicken of the Sea. But this is precisely what he was doing, and he used the fax machine of someone unaffiliated with Bumble Bee in order to conceal the conspiracy from those not involved in it.

133.   Upon receipt of the faxed "StarKist Seafood Price Increases" document from Bumble Bee's Scott Cameron, Chicken of the Sea's Mike White forwarded it to Chicken of the Sea's Don George and Bruce Reynolds.  Don George would soon depart Chicken of the Sea for Bumble Bee, where he would collude with Mike White on behalf of Bumble Bee for the remainder of the conspiracy period. Chicken of the Sea's Bruce Reynolds and Bumble Bee's Scott Cameron knew each other, and had their own long history of exchanging competitive pricing information with one another

134.   Upon receipt of the faxed StarKist pricing document, Reynolds transcribed portions that were difficult to read in a separate email and sent it to Mike White.

135.   Bumble Bee now provided Del Monte with assurance that it, Bumble Bee, would support the Del Monte/StarKist price increase. On or about February 17, 2006, Keith Schoepflin of Del Monte received a spreadsheet reflecting Bumble

Bee's current price list. Schoepflin forwarded the price list to others at Del Monte.[5]

136.    Between early February and early March 2006, Chicken of the Sea President & CEO John Signorino (who replaced Mussell as CEO) and Bumble Bee President & CEO Chris Lischewski spoke by telephone several times.  They also attended a dinner together on or around March 1, 2006.  During this period, their two companies were talking to each other, and Bumble Bee was communicating with Del Monte, about supporting the Del Monte price increase.  Discovery will be necessary to determine whether, during their conversations, Signorino and Lischewski, like others in their companies, discussed a Packaged Tuna price increase.  Even if they had not, Bumble Bee and Chicken of the Sea, through other executives identified above, had agreed with Del Monte to support the StarKist price increase.

137.    Consequently, on March 6, 2006, Chicken of the Sea announced a price increase of approximately 6% on white meat tuna products, the same prices announced by the StarKist Conspirators.  For example, Chicken of the Sea raised prices on cases of solid white tuna in water to $58.08 and on 24-packs of solid white tuna in oil to $29.04, which exactly matched the prices announced by Del Monte/StarKist.

138.    Thereafter, Bumble Bee announced a price increase on white meat tuna products that matched the conspiratorial prices. Bumble Bee made its announcement on April 17, 2006. Both the Bumble Bee and the Chicken of the Sea price increases went into effect in the first week of July 2006.

139.    The conspiracy had immediate results. For example, the popular six-

---

[5]    Although Schoepflin received the spreadsheet file in electronic format, the StarKist Conspirators did not produce any email indicating the source of the file either to the Grand Jury investigating Conspirators' misconduct or to Plaintiffs. Accordingly, on information and belief, Schoepflin either received the file in person on a portable storage device such as a flash drive, or he received the file via email and deleted the incoming email from the company's server.

ounce chunk light tuna price, which had decreased to 54 cents a can by early 2004, increased to 58 cents a can by late 2004 and early 2005, to 62 cents a can by August 2005, and to 68 cents per can by August 2007. Moreover, Conspirators had learned how to conspire effectively, and used many of the same methods (exchange of confidential documents, direct phone calls between conspirators) and key executives (such as Mike White, Kenneth Worsham, Don George, Scott Cameron) to repeat the feat many more times over the course of the conspiracy period.

## 2.      Collusion on Package Size Changes in 2007-08

140.   In late 2007, Del Monte, Bumble Bee and Chicken of the Sea agreed to raise packaged tuna prices by decreasing the size of the package, and the amount of tuna contained in those cans and pouches, without also decreasing prices. While Del Monte later attempted to justify the downsize as necessitated by higher costs and environmental conservation (it claimed the downsize would result in substantially less water usage), Del Monte executives internally pitched the downsize as a way to increase profits by disguising a price increase as a mere package change.

141.   However, Del Monte needed to bring its competitors along, otherwise its smaller package at the same price would be too noticeable on the shelves, and its customers would balk. On December 1, 2007, John DeBeer, Vice-President of Special Products at Chicken of the Sea, spoke with Del Monte's Barry Mills, General Manager of StarKist Samoa and a Vice-President of Del Monte, regarding the downsizing of six ounce cans of tuna to five ounce cans. At that time, Mills used a Del Monte email address and was a Del Monte employee.

142.   That same day, DeBeer reported his conversation to his colleagues at Chicken of the Sea. He advised Chicken of the Sea CEO Shue Wing Chan, Chicken of the Sea Vice-President of Procurement Kevin McClain, Chicken of the Sea Vice-President of Marketing Michael White, and Robert Blatt of Chicken of the Sea that

Del Monte/StarKist "was very willing to talk about this and hoped that all 3 of the canners would switch."[6]

143.   Del Monte, Bumble Bee, and Chicken of the Sea all recognized that Del Monte would not go forward with the change absent an agreement from Bumble Bee and Chicken of the Sea that they also would decrease their tuna packaging size. Absent an agreement among all three Conspirators to reduce packaging size, it would have been against the individual interest of any one Conspirator to make the shift for fear of losing market share as major customers were opposed to downsizing and threatened to drop any brand that made the switch in favor of a brand that did not make the switch. Thus, all Conspirators had to agree (and agreed) to downsize their tuna packages before any could proceed with their plans.

144.   On December 10, 2007, Chicken of the Sea's DeBeer wrote to Bumble Bee's Sheri Glazebrook—a VP General Manager—to confirm that Del Monte planned to downsize its StarKist packaged tuna. The same day, Bumble Bee's Chris Lischewski also reported to Bumble Bee executives, including Dave Melbourne, Scott Cameron, Kenneth Worsham, and Doug Hines, that Lischewski had confirmed that Del Monte's StarKist was planning to downsize to a five ounce net weight and launch the new size in May 2008, and that Chicken of the Sea was planning a similar move.

145.   After StarKist initiated the discussions, Bumble Bee and Chicken of the Sea had two in-person meetings in January 2008 to discuss an agreement to downsize their cans. Chicken of the Sea/Thai Union's Shue Wing Chan and Thiraphong Chansiri and Bumble Bee Vice-President and Chief Operating Officer, Doug Hines, arranged a "pre-meeting" between Hines, Bumble Bee's Morrie

---

[6]   Shue Wing Chan's participation in the conspiratorial events described in this Complaint were undertaken on behalf of both Tri-Union and Thai Union. He frequently briefed Thai Union colleagues, including Thiraphong Chansiri, on Del Monte's and Bumble Bee's plans, and sought approval from Chansiri and other Thai Union executives before Chicken of the Sea joined the downsize.

Callaghan (a member of the Bumble Bee package downsizing team), and DeBeer in San Diego between January 2 and 4, 2008, and a meeting between Morrie Callaghan and Chicken of the Sea executives in Samoa on January 21, 2008. The subject of the e-mail thread was labeled confidential; Conspirators noted that it would be better if fewer individuals were involved in these meetings in order to keep them secret.

146. On December 27, 2007, Bumble Bee executives discussed how to implement the downsize and the planned timing of Del Monte's move. Lischewski stated to his colleagues that he would reach out to Del Monte directly in early January 2008. As promised, on January 4, 2008, Lischewski reported to fellow Bumble Bee executives, Ken Worsham, Scott Cameron, and Don Gallagher, that StarKist was planning its downsize for May 2008. Lischewski also stated that both Chicken of the Sea and Bumble Bee were making similar plans, although Bumble Bee might not be ready until later in the year. Lischewski asked his colleagues to keep the information confidential.

147. The package-reduction agreement was facilitated by Impress USA, Inc., a canner with facilities in American Samoa.  In 2007-08, Impress had a strong commercial relationship with Del Monte, Bumble Bee and Chicken of the Sea. Impress scheduled a series of meetings with representatives of Del Monte (on behalf of StarKist), Chicken of the Sea, and Bumble Bee.

148. Impress scheduled a meeting with Del Monte (then the owner of StarKist) for January 7, 2008 in Los Angeles, California on Terminal Island. Chicken of the Sea met with Impress two days later, on January 9, 2008, in Chicken of the Sea's offices. The day after Impress' meeting with Chicken of the Sea, Bumble Bee executives had a full summary of its contents, including a statement that Chicken of the Sea wished to discuss the issue in a forum with StarKist and Bumble Bee. Bumble Bee CEO Chris Lischewski expressed the same sentiment (that the industry needed to discuss the issue together) to the NFI's John Connelly, although he asked Connelly to keep the communication confidential.

149.   Just days after Impress' meetings with Del Monte (StarKist) and Chicken of the Sea, Marty Belleville of Impress informed Jim Cox, Director of Engineering and Purchasing at Chicken of the Sea, that Del Monte's StarKist wanted to know if the "other" guys (Chicken of the Sea and Bumble Bee) were going to join the downsize.  He continued: "Since leaving San Diego with you and the 'other' guys, we have heard nothing more from them [StarKist] except to ask if the 'other' guys are going to move to this size too."

150.   On February 1, 2008, Sawyer sent an e-mail to White, McClain and Chan confirming that Del Monte's StarKist was resizing tuna in a pouch as well, from 7 ounces and 3 ounces to 6.4 and 2.6 ounces, respectively.  Bumble Bee had this information by February 19, 2008.

151.   On March 7, 2008, Bumble Bee's Hines suggested in an email to Chicken of the Sea's Kevin McClain and Shue Wing Chan that they have an in-person meeting, together with Lischewski, to discuss the planned reduction to a five ounce can.

152.   Chicken of the Sea and Bumble Bee executives met at Milton's, a restaurant with a private back room on Via de la Valle in Del Mar, California at 8:00 a.m. on Thursday, March 13, 2008.  In attendance were Lischewski and Hines of Bumble Bee and McClain, Sawyer and Chan of Chicken of the Sea. The executives agreed to join Del Monte in downsizing tuna package sizes.

153.   The next day, a series of internal e-mails among Chicken of the Sea executives discussed the logistics of downsizing, considered how various customers might react to the change to a five ounce can, and confirmed that Chicken of the Sea would proceed with the downsize. On the same day, Bumble Bee had an internal meeting where the decision to downsize was announced. Bumble Bee's Scott Cameron advised his colleagues that Del Monte had initiated the move as a way to increase prices.

154.   As discussed above, any Conspirator that downsized their packages unilaterally would have faced fierce customer backlash and market share loss. Thus, Del Monte/StarKist did not begin the process of converting its cans until late April 2008, after receiving assurances from its co-conspirators that they were downsizing as well.

155.   To ensure its competitors were on board with the plan, Del Monte provided them with its internal plans to help them timely execute the downsize. On April 12, 2008, Bumble Bee's Scott Cameron circulated to senior executives at Bumble Bee, in an email marked confidential, a Del Monte presentation (dated April 11, 2008) with its internal sales field execution details of Del Monte's plans to rollout its downsized StarKist packages. The presentation was marked "Confidential – Internal Distribution Only." The presentation explained that the downsize would be more effective than a traditional price increase because research suggested that consumers were not concerned about package size and would perceive the smaller packages as more filled (even though there would be less tuna in the can). The presentation was received by Cameron on April 11, 2008, the same day the presentation was made at Del Monte's StarKist, and thus could not have come to Bumble Bee from any channel other than from Del Monte itself. On or around the same date, the same internal Del Monte presentation made its way into Chicken of the Sea's files.

156.   On April 29, 2008, Chicken of the Sea's John Sawyer circulated to senior executives at Chicken of the Sea selected pages from another confidential presentation by Del Monte/StarKist marked for "Internal Distribution Only" concerning the downsizing. The presentation had been provided to Chicken of the Sea's Joe Clancy, who had previously been an executive at StarKist prior to becoming Chicken of the Sea's Vice President of Retail Sales in 2002. The presentation explained the respective roles of StarKist and Del Monte in implementing the package resizing and the complete timetable for that

implementation. The presentation also indicated that by July 21, 2008, old package sizes of packaged tuna would no longer be available and would be replaced with the new package sizes.

157.   In or around May 2008, Bumble Bee began to give presentations to its customers that flatly misled them about the reason for Bumble Bee's decision to downsize its cans. Although Bumble Bee's executives, including its CEO and President, Chris Lischewski, had been colluding with its competitors directly and indirectly on this issue since at least January 2008, the presentation stated that Bumble Bee had decided to downsize in <u>March 2008</u> after it purportedly learned about StarKist's plans for the first time from its customers. But Bumble Bee's knowledge of Del Monte's downsize came not from other customers but directly from StarKist, including from a January 25, 2008 internal Del Monte strategy document marked "confidential, internal use only," that was provided to Bumble Bee by Del Monte as part of the competitors' collusive communications.

158.   Thereafter, beginning in or about July 21, 2008, Bumble Bee, Chicken of the Sea and Del Monte/StarKist began distributing five ounce cans of tuna to replace their six ounce cans, as well as downsized pouched tuna. The size change increased the price per ounce of packaged tuna sold to Plaintiffs by 20 percent. In addition, as detailed below, by the time the downsize was announced, Conspirators were colluding on a list price increase.

159.   Thai Union participated directly in, and approved of, the collusive decision to resize cans and pouches. In January of 2008, Chicken of the Sea's Shue Wing Chan wrote to Thai Union's Thiraphong Chansiri and Cheng Nuruttinanon, advising them of the ongoing plans of StarKist and Bumble Bee, how any can re-sizing would necessitate modifications to production lines, and how Thai Union's approval would be needed before the resizing could be implemented.

160.   By January 27, 2008, Chan had advised Thiraphong Chansiri and Cheng Nuruttinanon that Impress was funneling information from Del Monte/

StarKist to Chicken of the Sea about StarKist's plans to downsize cans and pouches. He also briefed his Thai Union superiors on the risk of customer reactions that made a single-firm package downsizing unfeasible.

161.   On February 3, 2008, Shue Wing Chan updated Thai Union's Cheng Nirruthinanon and Thiraphong Chansiri, among others, with further information about Del Monte's latest downsize plans including the inclusion of pouches and his belief that Bumble Bee would go along.

162.   On April 10, 2008, Pornchai Tatiyachaitaweesuk (now Deputy General Manager of Marketing for Thai Union and formerly Sales & Marketing Director for Thai Union Manufacturing) advised Shue Wing Chan and Thiraphong Chansiri, among others, that he had spoken directly with Del Monte's StarKist and confirmed that it would be starting production on the smaller cans and the associated start and canning shutdown dates.

163.   In May 2008, Shue Wing Chan advised ten executives of Thai Union (including Thiraphong Chansiri and Cheng Niruttinanon) of the progress in American Samoa of the transition to five-ounce cans.

164.   As reflected above, Thai Union authorized Chicken of the Sea to go forward with the collusive downsizing scheme.

### 3.   Collusion on 2008 List Price Increases

165.   Not content with making customers pay the same amount for a smaller package of tuna, Conspirators also colluded to raise list prices for Packaged Tuna in 2008.

166.   In late May 2008, a series of industry meetings were held in Bangkok, Thailand that were attended by Conspirators' executives, including a May 27, 2008 meeting chaired by the NFI at the Four Seasons Hotel. The Four Seasons Hotel meeting was attended by, upon information and belief, Chicken of the Sea's Kevin McClain and Shue Wing Chan; Del Monte's Susan Jackson; and Bumble Bee's Chris Lischewski.

167.  Soon thereafter, Chicken of the Sea contacted by telephone executives at Bumble Bee and StarKist to determine if they would join in a list price increase. Chicken of the Sea's Mike White spoke by phone with Don George, Bumble Bee's Vice-President of Sales who had previously worked at Chicken of the Sea, and Kenneth Worsham, who has since pled guilty to price fixing. Chicken of the Sea's Joe Clancy, a former executive of Del Monte's StarKist reached out to one of his former colleagues, who included, for example, Robert Worsham, a pricing consultant for Del Monte's StarKist and the father of Bumble Bee's Kenneth Worsham. A series of telephone calls resulted in an agreement that all three companies would announce list price increases at approximately the same time and at similar magnitudes.

168.  By June 12, 2008, Chicken of the Sea's John Sawyer circulated price and cost information in advance of an internal conference call scheduled for the next day to plan for a fourth quarter price increase on tuna.

169.  The next day, Chicken of the Sea's Joe Clancy provided John Sawyer with information from a confidential, internal Del Monte conference call held on the same day regarding details of Del Monte's plan for a price increase on Del Monte chunk light meat tuna. On June 14, 2008, Sawyer used the data from Del Monte to adjust Chicken of the Sea's planned prices.

170.  On June 16, 2008, Chicken of the Sea's Joe Clancy provided additional information to Sawyer on Del Monte's price increase plans for chunk light tuna, confirming that StarKist was also planning list price increases for solid white tuna and recommending that such prices be confirmed. Sawyer forwarded the information to fellow Chicken of the Sea executives Mike White and Darren Parsons. On the same day, Bumble Bee's Scott Cameron circulated to his Bumble Bee colleagues similar Del Monte confidential and proprietary, inside information. This information came to Chicken of the Sea and Bumble Bee via Joe Clancy and Don Gallagher, respectively, both of whom are former StarKist employees, and

thus, upon information and belief, the StarKist plans came to Clancy and Gallagher directly from Del Monte.

171.   On June 30, 2008, Bumble Bee's Donald Gallagher advised a Bumble Bee colleague that he expected Chicken of the Sea's price increase bulletin to be issued later that day, and believed the price increases would be in line with Bumble Bee's price increases.

172.   On or around July 3, 2008, Chicken of the Sea advised its executives that because StarKist and Bumble Bee would start shipping their higher-priced five-ounce products before Chicken of the Sea, they should not allow customers to stock up on Chicken of the Sea's lower priced products. Chicken of the Sea wanted to ensure that the list price increases of its coconspirators, which it would soon join, were not undermined by purchases of its remaining six-ounce cans.

173.   Del Monte, Chicken of the Sea, and Bumble Bee issued list price increases in the third quarter of 2008, many of which were nearly identical for various types of Packaged Tuna. Bumble Bee's list was issued on or around June 27, 2008, effective September 29, 2008. Chicken of the Sea advised its customers of its list price increase on or around July 3, 2008, effective September 1, 2008. On or around June 17, 2008, Del Monte issued a list price increase effective July 21, 2008.

174.   Dongwon knew of and actively supported both the downsizing initiative and this collusive price increases. By July 2008, Del Monte had made a presentation to Dongwon assuring the new parent-to-be that Chicken of the Sea and Bumble Bee were joining StarKist in downsizing their tuna package sizes. In October 2008, Dongwon sought to ensure that all customers were charged the increased prices; Del Monte employees assured Dongwon that there were no exceptions. By this point, Dongwon clearly had approved and joined in StarKist's illegal list pricing moves in the United States.

### 4.     Collusion on 2010 Net Price Increases

175.   Bumble Bee, StarKist and Chicken of the Sea conspired again in 2010 to raise net prices on various Packaged Tuna products, particularly chunk light tuna. Announcing an increase in net prices is unusual in the Packaged Tuna industry because they are usually only given to the Conspirators' sales brokers and not broadly announced to the trade. Further, net prices most often are given orally and not in a letter. It is also unusual to announce mid-quarter increases. Here, Conspirators' collusive price increases were announced mid-quarter and the net prices were disclosed in a letter. The price increases were all announced in or around May 2010, and took effect in the third quarter of 2010. The increases were nearly identical on a per unit basis.

176.   These price increases were the result of an agreement reached through various meetings, telephone calls, and e-mails among Conspirators. Among those involved were Chicken of the Sea's Mike White, John Sawyer, and Joe Clancy and Bumble Bee's Kenneth Worsham, Dave Melbourne and Don George. StarKist's Joe Tuza and Melissa Murphy-Brown were also involved in these communications.

177.   In April 2010, Chicken of the Sea began considering another price increase; it learned in late April or early May that StarKist was planning to do the same. After learning about StarKist's intentions, Chicken of the Sea proceeded with a net price increase of its own. Thereafter, Mike White of Chicken of the Sea called Bumble Bee's Kenneth Worsham and Don George multiple times to persuade Bumble Bee to join Chicken of the Sea and StarKist in raising net prices.

178.   On or around April 26-27, 2010, StarKist's Joe Tuza and Melissa Murphy-Brown, Bumble Bee's Dave Melbourne, and Chicken of the Sea's John Sawyer were all in Washington D.C. for an NFI meeting; they all stayed at the Washington Marriott in Georgetown. The NFI venue provided an opportunity for high-level talks between them about the forthcoming joint price increase.

179.   On the morning of April 27, Chicken of the Sea's Joe Clancy called Chicken of the Sea's Mike White from his cell phone at 6.40 a.m. and spoke with him for 20 minutes. Joe Clancy maintained close ties to his former StarKist colleagues and was again serving as a conduit between the conspirators. Later the same day, Mike White had three telephone calls with Bumble Bee's Don George, totaling 13 minutes. The next day, Mike White and Don George spoke by phone again—this time for 17 minutes.

180.   On or around May 3, 2010, StarKist issued a nonpublic letter to its brokers advising of a net price increase to be effective on or around June 28, 2010. A presentation was provided to be shared with customers pretextually blaming the increase on such factors as fishery closures. The letter was issued while executives from all three companies—Chicken of the Sea's John Sawyer, Bumble Bee's Dave Melbourne, and StarKist's Melissa Murphy-Brown attended a May 3-5, 2010 NFI meeting in New York City, where they all stayed at the Hotel Roger Williams on Madison Avenue.

181.   On May 4, 2010, Chicken of the Sea's White spoke by phone with Bumble Bee's Ken Worsham (21 minutes) and Bumble Bee's Don George (9 minutes).

182.   Although the StarKist price increase letter was not public, by May 4, 2010, Chicken of the Sea's Sawyer scheduled a call with his executives, including Mike White and Shue Wing Chan, to discuss the details of their own plan. By the same date, White had circulated internally a proposed Chicken of the Sea price increase plan to his colleagues John Sawyer, Shue Wing Chan, Joe Clancy, and Darren Parsons, and a draft Chicken of the Sea presentation also pretextually blaming fishing restrictions for the increase.

183.   On May 5, 2010, Mike White called Joe Clancy again at 6:49 am and spoke with him for 13 minutes. Later that day, Mike White spoke by phone with Don George twice for almost 40 minutes.

184.   A dinner meeting of NFI participants scheduled for 6:30 pm on May 5, 2010 at the Benjamin Steak House located at 52 East 41st Street, New York City was organized by NFI's Mary Hansan. Chicken of the Sea's John Sawyer, Bumble Bee's Dave Melbourne, and StarKist's Melissa Murphy-Brown again attended. This private dinner meeting provided an opportunity for StarKist personnel to ensure that the three major Packaged Tuna suppliers were in accord on pricing for the last half of 2010.

185.   On May 6, 2010, Chicken of the Sea's Mike White exchanged no fewer than five calls with Bumble Bee's Kenneth Worsham and Don George, totaling 23 minutes. Mike White also sent a text message to Kenneth Worsham.

186.   On May 11, 2010, Mike White called Bumble Bee's Don George again. The next day, Mike White called Joe Clancy and spoke with him for 7 minutes at 6:39 am. White's next call was to Don George, with whom he spoke for 7 minutes. Chicken of the Sea issued a letter announcing a net price increase on or around May 14, 2010, effective August 2010. Like StarKist, it pretextually blamed fishing restrictions for the increase. On the day of the announcement, Mike White and Joe Clancy spoke by phone for 38 minutes.

187.   On May 17, 2010, Mike White and Joe Clancy spoke again for 12 minutes at 6:41 am. The same morning, Joe Clancy e-mailed to his colleagues Mike White, Darren Parsons and John Sawyer StarKist's actual net price increase circular to brokers. Sawyer responded "[n]o real surprise," offered Joe Clancy "[t]wo bottles of 2007 Kongsgaard" (a Napa Valley California limited edition cabernet sauvignon retailing for over $100 a bottle), and thanked Mike White "for handling."

188.   The same day that Chicken of the Sea's Clancy secured a copy of StarKist's price increase circular, Chicken of the Sea's Mike White spoke with Bumble Bee's Ken Worsham for 10 minutes.

189.   On May 19, 2010, a meeting of the NFI's Tuna Council was attended by StarKist's Don Binotto, Melissa Murphy-Brown, and Joe Tuza; Bumble Bee's

Chris Lischewski and Dave Melbourne, and Chicken of the Sea's John Sawyer, Shue Wing Chan, and Kevin Bixler.

190.   On May 20, 2010, Chicken of the Sea's Mike White and Bumble Bee's Don George spoke by phone for 20 minutes.

191.   On or about May 21, 2010, Bumble Bee issued its net price increase letter, which was effective in or around August 2010. All of the net price increase announcements were set at nearly identical levels. Like StarKist and Chicken of the Sea, Bumble Bee pretextually blamed fishing restrictions for its price increases.

### 5.   Collusion on 2011 Price Increases

192.   Conspirators colluded again on price increases for Packaged Tuna products announced in the second quarter of 2011. StarKist wished to take a full line list price increase and discussed with Chicken of the Sea and Bumble Bee if they would join it, which they agreed to do. Chicken of the Sea's Mike White had a series of calls with Chuck Handford, who was then StarKist's Vice President of Trade Marketing, and Bumble Bee's Kenneth Worsham and Don George, about the details of StarKist's plan and Chicken of the Sea's and Bumble Bee's plans to issue their own price announcements.

193.   In January 2011, StarKist executives began discussing the possibility of another Packaged Tuna price increase. At the same time, StarKist's Joe Tuza and Melissa Murphy-Brown; Bumble Bee's Chris Lischewski and Dave Melbourne; and Chicken of the Sea's John Sawyer were collaborating closely on various NFI matters, including the companies' joint Tuna the Wonderfish campaign. On or around January 26-27, 2011 they met in San Diego for ISSF and NFI meetings. Chicken of the Sea's Shue Wing Chan attended the San Diego meetings, as well.

194.   Discussions about the forthcoming price increase occurred among StarKist, Bumble Bee, and Chicken of the Sea throughout February 2011. On February 1, 2011, Chicken of the Sea's Mike White spoke by phone with Bumble Bee's Ken Worsham for almost a half hour. The next day, Mike White spoke by

phone with StarKist's Chuck Handford for almost a half hour. White also had multiple calls with Bumble Bee's Don George during February 3-10, 2011.

195.  On February 22, 2011, Chicken of the Sea's Mike White spoke by cell phone with Bumble Bee's Ken Worsham for 13 minutes. That same day, Kenneth Worsham advised his Bumble Bee colleagues that a price list was coming from a competitor by March 1, and circulated material to allow Bumble Bee to plan its own price increase, noting that Bumble Bee would have to trail by at least 30 days.

196.  Over the next two days, Mike White spoke by cell phone with Bumble Bee's Don George for 16 minutes. On February 23, February 24 and February 26, Mike White also called and sent text messages to StarKist's Chuck Handford. On February 23, 2011, Kenneth Worsham advised his colleagues that StarKist would increase the list prices on all of its tuna products.

197.  White spoke with Bumble Bee's Ken Worsham on February 28, 2011 for 7 minutes and StarKist's Chuck Handford for 8 minutes.

198.  On March 1, 2011, Chicken of the Sea's John Sawyer stated to his fellow Chicken of the Sea executives that fish costs had peaked and were now flat, and that he did not believe a list price increase was justified.

199.  On March 2, 2011, Mike White spoke with StarKist's Chuck Handford for 7 minutes. StarKist then announced a list price increase between March 2 and March 4, 2011, effective May 30, 2011, pretextually citing cost increases. The increase applied to the majority of its Packaged Tuna products.

200.  By March 4, 2011, Mike White sent StarKist's price increase materials to Chicken of the Sea managers, telling them to "Keep this info in the family." They were also told not to request lower pricing, which Chicken of the Sea knew would undermine Conspirators' collusive price increases.

201.  On March 3 and 4, 2011, Mike White had calls with both Kenneth Worsham and Don George of Bumble Bee. Mike White then sent the StarKist announcement to Don George, using George's private email address, rather than his

Bumble Bee work email address. White used the cryptic subject line "Catching Up" with no message in the body of the email, in an effort to disguise the secret, collusive communication between competitors who were planning a joint price increase. Between March 3 and March 7, White also sent six text messages to George.

202.   On March 7 and 8, 2011, Mike White spoke with Don George for 17 minutes.

203.   On or around March 10, 2011, Bumble Bee announced to its brokers "broad scale list price increases" across many of its Packaged Tuna products, effective May 29, 2011, citing cost increases "with no signs of relief in the near future."

204.   Between March 10 and 15, 2011, Chicken of the Sea's Mike White communicated with Bumble Bee's Don George and Kenneth Worsham by phone and text messages many times; indeed, no fewer than 16 text messages and multiple calls were exchanged. On March 15, Mike White and StarKist's Chuck Handford had two calls. Chicken of the Sea was wavering because it believed costs would decline soon and saw an opportunity to gain volume at the expense of its competitors. Bumble Bee and StarKist needed to ensure that Chicken of the Sea honored their conspiratorial agreement.

205.   On March 16, 2011, there was an NFI conference call attended by Chicken of the Sea's John Sawyer, StarKist's Joe Tuza and Melissa Murphy-Brown, and Bumble Bee's Dave Melbourne.

206.   The next day, Chicken of the Sea announced to its brokers that it would increase its tuna net prices, effective June 1, 2011, citing cost increases, even though Chicken of the Sea's John Sawyer had internally stated that costs had stabilized and would soon decrease. Chicken of the Sea's increase, based on a comparison of net to list prices, was proportional to StarKist's and Bumble Bee's list price increases.

207.   Following the announcement of these price increases, on June 29, 2011, Bumble Bee CEO and President Chris Lischewski forwarded a set of charts

that related to the implementation of the conspiracy price increases to Dongwon's Ingu Park. Lischewski asked that Park not share the charts or let others know that the information came from Lischewski. Park then forwarded the information to Dongwon's Andrew Choe.

208.   Later in October 2011, when a Dongwon executive expressed concern to StarKist President In-Soo Cho as to why StarKist's pricing was below its erstwhile competitors in certain outlets, In-Soo assured him that it was not true, and offered to go over the information with the Seoul team and Dongwon Chair J.C. Kim. Cho then instructed StarKist's Joe Tuza and Steve Hodge to ensure that StarKist's pricing was in accord with Bumble Bee and Chicken of the Sea.

209.   Along the same lines, in August 2011, StarKist's Chuck Handford contacted Bumble Bee's Scott Cameron regarding rumors that it was pulling back its price increase. Cameron assured Handford that this was not the case, asking "why the hell would we do this????"

210.   As set out above, by exchanging pricing information among high-level executives, the erstwhile competitors were able to police whether each was adhering to their agreement.

211.   Dongwon's Andrew Choe analyzed the results of the StarKist list price increase closely and determined that it was responsible for 5.8% of an 11.2% total increase in prices, with the remaining amount attributable to a reduction in promotions (see discussion about collusion to limit promotions below). Dongwon and StarKist were pleased and as discussed below, would soon initiate discussions with their erstwhile competitors about yet another collusive increase.

### 6.        Collusion on List Price Increases In 2011-12

212.   In December 2011 and January 2012, telephone conversations and email communications occurred between senior executives and sales personnel of Bumble Bee, Chicken of the Sea, and StarKist, about announcing a price increase for a number of products in the second quarter of 2012.  The senior executives who

participated in these communications included, at least, Chicken of the Sea's Mike White and Hubert Tucker; Bumble Bee's Don George, Scott Cameron and Kenneth Worsham; and StarKist's Steve Hodge and Bruce Bollmer. These discussions led to Conspirators' agreement to increase packaged tuna prices by nearly identical amounts, and that Chicken of the Sea and Bumble Bee would raise prices by substantially similar amounts.

213.   Plans for the increase were hatched between December 15, 2011 and December 20, 2011, when multiple calls and text messages were exchanged between StarKist Senior Vice President Steve Hodge and Chicken of the Sea's Mike White and John Sawyer. On December 20, 2011, consistent with what had become their pattern, White then reached out to Bumble Bee's Don George by phone call and text messages. Calls and texts continued to be exchanged between White and George throughout the remainder of December through January 3, 2012. On January 3, 2012, White then spoke again with StarKist's Hodge, and that communication was immediately followed by more calls and texts between White and George through January 9, 2012. On January 12, 2012, StarKist's Hodge called Chicken of the Sea's Mike White, and the call was followed by two text messages between Hodge and White. By this date, an agreement had been reached.

214.   Pursuant to that agreement, Defendants and co-Conspirators announced collusive price increases as follows: StarKist on or about January 13, 2012; Bumble Bee on or about January 17, 2012; and Chicken of the Sea on or about January 18, 2012.  Each price increase announced identical (or virtually identical) increases on light and white tuna products.  For example, a 48 pack of five ounce cans of chunk light tuna in water increased from $40.80 to $43.68.  Other products also increased by identical percentages.  The Bumble Bee and Chicken of the Sea price increases were effective April 1, 2012; StarKist's price increase was effective on March 26, 2012.

215.   Chicken of the Sea's Mike White, StarKist's Bruce Bollmer, and Bumble Bee's Don George used their private email addresses to exchange new price lists in order to hide their illegal actions. Bumble Bee's Scott Cameron also exchanged price lists with Chicken of the Sea's Hubert Tucker, through an email address associated with Tucker's wife. These emails were sent using one-word cryptic or misleading subject lines like "test," "Hurry Home!", "You Got Something!", "[u]pdate", and "[i]nfo," all without body text. By promptly exchanging their lists, the conspirators were able to police each other's compliance with their agreement.

216.   The 2008-12 list price increases set benchmarks that affected all of Conspirators' subsequent Packaged Tuna list prices. However, the Defendants' and co-Conspirators Packaged Tuna collusion did not stop after the March 2012 price increase.

217.   On March 28, 2012, Bumble Bee's Kenneth Worsham and StarKist pricing consultant Robert Worsham also used the guise of their familial relationship to help their companies collude on another price increase. Kenneth Worsham sent his father a spreadsheet detailing an upcoming not-yet-announced price increase on Bumble Bee Packaged Tuna. The Bumble Bee price increase was not formally announced until March 30, 2012. On or around April 26, 2012, StarKist announced a substantially similar price increase.

218.   Conspirators continued to share sensitive pricing and market share information in order to police each other's adherence to the collusive agreements. For example, throughout 2012 and mid-way through 2013, StarKist's Steve Hodge and Bob Worsham sent Bumble Bee's Kenneth Worsham market share and pricing information about the three companies on a weekly basis. By monitoring market share, the companies could identify sudden spikes that would reveal whether one competitor was cheating on their agreement and therefore make such cheating (*i.e.* true price competition) less likely to occur.

219.   Chicken of the Sea's Hubert Tucker continued to use his and his wife's private email accounts to pass internal Chicken of the Sea documents to Bumble Bee's Scott Cameron. In May 2014, by then a StarKist employee, Tucker asked Chicken of the Sea's Mike White to send a price list to his private email address. Chicken of the Sea's Mike White continued to speak by phone to Bumble Bee's Don George. Private dinners and other social events continued to be venues for high-level executives of Chicken of the Sea, Bumble Bee, and StarKist to collude. All of these channels of collusion remained open and tuna prices continued to be inflated.

### 7.   Collusion on Offering "FAD Free" Branded Tuna Products

220.   Conspirators also conspired not to compete by collectively agreeing not to offer branded tuna products labeled as being "FAD free." FAD-free tuna is tuna caught without the use of fish aggregation devices. Because FADs are considered unsustainable and destructive to ocean ecosystems, there is a growing demand among consumers for FAD-free tuna. However, FAD-free methods of catching tuna are costly. Conspirators saw FAD-free tuna as a threat to their selling margins. However, if any one Conspirator put out such a product, the others would have to follow or risk losing sales.

221.   By early November 2011, Chris Lischewski of Bumble Bee, Shue Wing Chan of Chicken of the Sea, and In-Soo Cho of StarKist had collaborated on an article attacking Greenpeace and other environmental groups for criticizing the way tuna is harvested. The sustainability issue came up in late 2011 in debates within the NFI.

222.   In February 2012, StarKist, Bumble Bee and Chicken of the Sea entered into an agreement not to compete on the sale of FAD-free canned tuna.  Each company agreed that it would not sell any FAD-free product under its own label, despite strong and growing demand by consumers for FAD-free products. Senior executives at StarKist, Bumble Bee and Chicken of the Sea began discussing this topic in e-mails in late 2011, and reached an agreement in a telephone conference

among all three companies during the week of February 6, 2012. The participants were John Sawyer and Shue Wing Chan of Chicken of the Sea; Chris Lischewski and David Melbourne, a Senior Vice-President of Consumer Marketing of Bumble Bee; and Melissa Murphy-Brown and Frank Pogue (Vice-President of Marketing and Innovation) of StarKist. Their agreement was confirmed in a February 17, 2012 email between Chicken of the Sea's John Sawyer and Bumble Bee's Dave Melbourne, which Sawyer forwarded to Shue Wing Chan with the note "Just so you have a copy of BB commitment to not offer [FAD-free] brands." Chan replied "Noted with thanks."

223.   On March 6, 2012, Bumble Bee's Kevin McClain (formerly of Chicken of the Sea) wrote to Bumble Bee's Dave Melbourne: "I have not done anything to move the [pole and line] yellowfin forward. To me this falls under the agreement Chris [Lischewski] made with the other brands not to pursue that on branded business."

224.   In an April 2013 email to StarKist's Frank Pogue, Chicken of the Sea's Sawyer referred to their mutual agreement not to offer a branded FAD-free product as "what we as an industry agreed to." Sawyer again forwarded the exchange to Chan, who thanked him for it.

225.   Conspirators agreement not to compete by producing branded tuna labeled "FAD Free" ensured that FAD-free tuna, which would be more costly to produce and have a lower profit margin, did not cannibalize sales of their non-FAD-free tuna products that were the subject of their price-fixing conspiracy.

### 8.   Collusion on Promotional Activity

226.   To ensure that their collusive tuna price increases would not erode, Conspirators also agreed to limit promotions on such products. Commencing in at least 2011 and continuing through at least June 2013, there were bilateral communications involving Conspirators' executives such as Shue Wing Chan of Chicken of the Sea and Chris Lischewski of Bumble Bee conducted through emails

and telephone calls during which they policed each other's promotions for Packaged Tuna. StarKist's Steve Hodge and Robert Worsham engaged in similar bilateral or trilateral communications with Bumble Bee's Kenneth Worsham, and Chicken of the Sea's Sawyer engaged in such communications with StarKist's Joe Tuza. As an example, one company executive would call another about what was perceived to be an aggressive promotion for assurance that it was limited in nature and not intended to upset agreed-upon market prices.

## IX.  THE UNITED STATES PACKAGED SEAFOOD MARKET IS CONDUCIVE TO COLLUSION

227.  The structure and characteristics of the Packaged Tuna market in the United States are conducive to a price-fixing agreement.

228.  Packaged Tuna is a commodity product sold directly to retail grocery chains, grocery wholesalers, and food distributors. Packaged Tuna varieties contain similar amounts of seafood, and are marketed in packages, including, but not limited to, cans, pouches, and cups. Purchasers of Packaged Tuna are more likely to be influenced by price than anything else when making a purchasing decision.

229.  There are substantial barriers precluding, or reducing, entry into the Packaged Tuna market, including high start-up costs (processing plants can cost tens of millions of dollars to build and maintain), manufacturing expertise, access to raw materials, and access to distribution channels. Therefore, Bumble Bee, Chicken of the Sea, and StarKist (and the related entities named herein) could collectively raise prices, and, in fact, raised prices, without fear of being undercut by new entrants.

230.  Purchasers routinely have sourced and do source virtually all their Packaged Tuna from Bumble Bee, Chicken of the Sea, and StarKist. Retailers and distributors must carry Conspirators' product lines in order to stay competitive in the markets in which they do business. As a result, Bumble Bee, StarKist, and Chicken of the Sea dominated the United States Packaged Tuna market during the Relevant Period, and continue to do so.

231.   Defendants and co-Conspirators possessed significant market power to raise prices for Packaged Tuna above competitive levels in the United States with a combined market share of 80-85% during 2004-2015. Upon information and belief, they conspired to ensure the stabilization and maintenance of their respective market shares in the Packaged Tuna market despite declining demand.

232.   There are no economically reasonable substitutes for Packaged Tuna. Alternative forms of seafood, such as frozen seafood or fresh seafood, require refrigeration and preparation, such as cooking, before they can be consumed, and lack the convenience, consistent portion size, and ease of use of Packaged Tuna.

## X.   PLAINTIFFS SUFFERED ANTITRUST INJURY

233.   During the Relevant Period, Defendants' and co-Conspirators' conspiracy had the following effects, among others:

a.   Price competition was restrained or eliminated with respect to Packaged Tuna; and

b.   The prices of Packaged Tuna were fixed, raised, maintained, or stabilized at artificially inflated levels.

234.   During the Relevant Period, Defendants and co-Conspirators charged supra-competitive prices for Packaged Tuna sold to Plaintiffs. By reason of Defendants' and co-Conspirators alleged violations of the antitrust laws, Plaintiffs sustained damages, injury, and harm to their businesses or property in an amount to be determined, having paid higher prices for Packaged Tuna than they otherwise would have paid absent Defendants' and co-Conspirators alleged illegal contract, combination, or conspiracy. This is an antitrust injury of the type the antitrust laws were meant to punish and prevent.

## XI.   TOLLING OF THE STATUTE OF LIMITATIONS

235.   Plaintiffs had neither actual nor constructive knowledge of the facts constituting their claims for relief.

236.   Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until at least July 2015. Indeed, the conspiracy was so organized and effective that it was only accidentally discovered by the DOJ in the process of reviewing internal company documents relating to the proposed merger between Chicken of the Sea and Bumble Bee.

237.   Defendants and co-Conspirators engaged in a secret conspiracy and did not reveal facts that would put Plaintiffs on inquiry notice that there was an agreement to fix prices for Packaged Tuna.  Defendants' and co-Conspirators collusive communications were conducted through private meetings, telephone calls, text messages, and emails between and among their executives that were not intended to be disclosed and were not disclosed beyond an inner circle of trusted high-level colleagues. Conspirators' communications with customers also offered plausible pretextual reasons for their similar price movements, Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy, and Defendants' and their co-Conspirators' involvement in the conspiracy, until July 23, 2015, when the DOJ's investigation first became public.

238.   Conspirators' executives, including Chicken of the Sea's Mike White and Herbert Tucker, Bumble Bee's Don George, and StarKist's Bruce Bollmer, exchanged pricing information through their personal email addresses, using cryptic subject lines and omitting body text to avoid detection.

239.   Because the conspiracy was actively concealed through secret communications among Defendants and co-Conspirators and pretextual communications to customers until July 23, 2015, Plaintiffs were unaware of Defendants' and their co-Conspirators' unlawful conduct, and did not know they were paying artificially high prices for Packaged Tuna.

240.   The affirmative acts of Defendants and their co-Conspirators, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

241.   Defendants and their co-Conspirators agreed among themselves not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal conspiracy.

242.   Defendants and their co-Conspirators met and communicated secretly concerning the pricing and marketing of Packaged Tuna to avoid detection.

243.   Throughout the Relevant Period, Conspirators secretly agreed to implement very similar or identical price increases on Packaged Tuna at similar times. To avoid detection by their customers, including Plaintiffs, Conspirators issued announcements and made other communications to the market that were intended to mislead their customers, including Plaintiffs, into believing that the pricing actions were taken independently by each Conspirator because of cost increases that Conspirators falsely claimed were unavoidable and industry-wide.

244.   The conspiracy was effectuated in part by the surreptitious exchange of price lists and internal pricing strategy documents among the Conspirators. Conspirators took care to make sure that the source of the documents (their erstwhile competitors) were kept secret apart from of a small circle of key executives. For example, in early 2004, Bumble Bee relied on Chicken of the Sea's non-public, internal pricing data to support a price increase. When Bumble Bee's Daniel Gerlach asked that a copy of the Chicken of the Sea price list be sent to him by e-mail or fax, Kenneth Worsham replied "overnight to dan . . . no faxes or e-mails." Gerlach replied "PARANOID!!!!"

245.   In early June 2004, Chicken of the Sea circulated amongst a small group of executives highly confidential internal Del Monte strategic pricing, customer and market share plans with the caution to "PLEASE PROTECT THIS INFORAMTION!!!!! [sic]"

246.   In the summer of 2004, Conspirators each collusively increased their packaged tuna prices by similar amounts. Chicken of the Sea, Del Monte on behalf of StarKist, and Bumble Bee announced increases in the price of six oz. packages of "chunk light" tuna, falsely attributing the increases to increased raw material costs due to, among other things, a dwindling supply of light tuna. In an August 30, 2004 communication to its sales agents, Chicken of the Sea falsely advised that the price increase was due to increased raw material costs, including natural gas, steel, freight and fuel, as well as "poor catch rates and tight supply." It instructed its agents: "It is critical that this information be shared with all customers **immediately**." (emphasis in original). On September 2, 2004, Chicken of the Sea announced to all of its customers that it would increase prices by approximately 8% on six oz. packages of light tuna, effective on orders placed after October 18, 2004. According to the announcement, the increase was attributable to, among other things, "poor fishing conditions."

247.   On September 2, 2004, Del Monte (at the time the owner of StarKist and the issuer of all StarKist price increases) held an earnings conference call on which its Chair, Rick Wolford, pretextually attributed the joint price increases not to collusion, but to a "similar experience that we all have with tight Skipjack as well as tight albacore supplies."

248.   These pretextual statements masked the truth: the 2004 price increases were initiated when the CEO of Chicken of the Sea decided to "put out a 'feeler' or a trade notice (that we do not send to the trade yet)" to its competitors about its desire for a price increase. It was furthered by the furtive transmission of confidential internal strategic and pricing information between StarKist, Chicken of the Sea, and Bumble Bee, and by meetings among executives at the highest level of each company during trade association meetings in Bangkok. None of these activities could feasibly be detected by outsiders.

249.   Plaintiffs accepted and relied on the proffered reasons for the price increases, in some cases incorporating the explanation into their contemporaneous internal communications about why all three suppliers were increasing their prices in very similar amounts.

250.   In 2006, Conspirators continued their conspiracy through direct phone calls between some of the same executives who would continue to conspire for the remainder of the Relevant Period. These executives had built a relationship of trust with each other because of their long histories together in the industry. Direct phone calls insured that no one outside a small close-knit circle would be aware of the collusive communications.

251.   In early February 2006, Bumble Bee's Scott Cameron, who later pled guilty to price-fixing, sent pages from a Del Monte document about an upcoming StarKist price increase to Chicken of the Sea's Mike White by using an office co-tenant's fax line rather than a fax line that could easily be traced back to Cameron. No cover sheet or other identifying information was included. When the competitors ultimately announced coordinated price increases on their white meat products, they again blamed the increases on input cost increases rather than collusion between competitors to keep prices and profits high.

252.   For example, on March 6, 2006, Chicken of the Sea's Anthony Montoya sent out a price increase announcement that pretextually blamed the albacore increases on raw material, fuel, steel and freight costs, and did not mention that the decision to increase was made only after reaching agreement with Bumble Bee and Del Monte. On April 17, 2006, a Bumble Bee price announcement sent out by Scott Cameron pretextually blamed the increase on increases in fuel, steel, and albacore costs, but failed to mention his own collusive conduct. Similarly, Del Monte blamed its increases on rising packaging and energy cost without revealing the collusion.

253. With respect to the package downsizing conduct in 2007-08, Conspirators fraudulently concealed their agreement to reduce the net weight of their tuna cans and pouches by several means. As pled herein in greater detail, Conspirators used a third party--Impress--to facilitate communications among the co-Conspirators, in an effort to conceal their conspiracy from Plaintiffs.  Using a third-party canner with no ties to Plaintiffs to facilitate communications reduced the number of direct, conspirator-to-conspirator communications, thus reducing the likelihood of detection.

254. Conspirators also fraudulently concealed their package downsizing conduct by relying upon coded references to their co-Conspirators so that any third parties would not know the true identities of the communicators as horizontal competitors.  Del Monte and Impress referred to Del Monte's co-Conspirators as the "other guys", rather than using their names, when discussing whether they were going to agree to the downsizing.

255. Conspirators avoided confirming or referencing their illegal agreement in writing, instead conducting most of their conspiratorial communications via direct conspirator-to-conspirator telephone calls, in-person meetings among the Conspirators, and in-person and telephonic communications through Impress, the third-party facilitator.  These communications include the telephone conversation between Del Monte's Mills and Chicken of the Sea's DeBeer on December 1, 2007; and Impress' *seriatim* meetings with Del Monte (on behalf of StarKist) and Chicken of the Sea on January 7 and January 9, 2008. One meeting between the Conspirators, originally scheduled for one Conspirator's office, was rescheduled to a time and place highly likely to avoid either detection or record: on March 13, 2008, the CEOs and others from Chicken of the Sea and Bumble Bee met for breakfast on a weekday morning at Milton's, a restaurant in Del Mar that has a private back room.

256. Indeed, in or around May 2008, Bumble Bee began to give presentations to its customers that flatly misled them about the reason for Bumble

Bee's decision to downsize its cans. Although Bumble Bee's executives, including its CEO and President, Chris Lischewski, had been colluding with erstwhile competitors directly and indirectly on this issue since at least January 2008, the presentation stated that Bumble Bee had decided to downsize in <u>March 2008</u> after confirming "from other customers the long alluded-to rumor that the Light Meat tuna brand leader Del Monte /Star-Kist will be downsizing all 6oz net weight sizes to 5oz." Bumble Bee's knowledge of Del Monte's downsize came not from "other customers" but directly from StarKist, including from a January 25, 2008 internal Del Monte strategy document marked "confidential, internal use only," that was provided to Bumble Bee as part of the companies' collusive communications.

257.   Another example of Conspirators' efforts to mislead their customers, including Plaintiffs, occurred in the summer of 2008 when Del Monte's StarKist, Bumble Bee, and Chicken of the Sea each announced they would increase tuna prices by an average of approximately 8.5% across the board. To mask their lockstep pricing as independent action, Conspirators again falsely cited increases in industry costs. For example, in its June 27, 2008 announcement, Bumble Bee attributed the joint move to increases in the "[c]osts of protein, packaging, steel, aluminum, transportation and fuel."

258.   On or around June 6, 2008, Chicken of the Sea sent a letter to its brokers giving the following rationale for price increases that occurred at the same time as the downsizing (prices were increased for remaining 6 oz. cans, and the price for 5 oz. cans was set at the same level as the price for the 6 oz. cans):

> [l]ight meat tuna raw material prices have gone up over $1,000 MT over the last two years.  Prices are not expected to retreat due to the strong worldwide demand and a weak Dollar.  Combine this fact with increases in production and supply chain costs Chicken of the Sea is announcing a list price increase on all chunk light tuna items.. . .

The letter also cited the following "increases unrelated to fish price: 15% increase in packaging; 29.5% increase in land and ocean freight; 30.0% increase in cannery utility; 33.3% increase in labor."

259.   Similarly, a published article at the time of the announcement of the can resizing stated that "a customer service representative for StarKist that explained that tuna prices have reached an all-time high, and coupled with the increased costs of transportation and other ingredients, they had to make a change." And another article said "in August of 2008 when the move had been implemented, StarKist stated that it did this primarily for environmental reasons, including the purpose of "sav[ing] two million gallons of water a year, while only taking out two teaspoons of tuna from each can." The existence of a price-fixing conspiracy as a reason for the price increase was not disclosed.

260.   On August 27, 2008, Del Monte issued a price announcement to all of its "Valued Customers," advising of a StarKist price increase, effective November 3, 2008, due to "continued escalation of global Tuna fish prices," and stating that "[o]ver the next several days our sales agency and/or local sales management will be in contact with you to provide additional details and review plans that will continue the growth of our mutual business." In accordance with its announcement, Del Monte's agents and representatives contacted its customers over the next several months to provide detailed, but misleading, explanations for both recent and forthcoming StarKist price increases.

261.   For example, on or about October 1, 2008, Affiliated Foods, Inc. received a copy of a presentation from a Del Monte/StarKist sales agent falsely blaming the price increases on "significant fish price inflation since the start of 2007," and stating that additional increases would be necessary because "[s]ince the 7/21/08 price increase, fish costs have continued to increase. Light Meat costs are up an additional 18% and White Meat costs are up an additional 14%," driven in part by "high fuel costs." Del Monte/StarKist's statements were misleading because

they failed to disclose that the true reason for the increase was Conspirators' illegal agreement.

262.   Del Monte's price increase and can resizing communications to its customers in the summer 2008 were so confusing that Bumble Bee's Kenneth Worsham approvingly described their language as smoke and mirrors.

263.   The 2008 collusive price increase agreement was particularly difficult to detect because it was formed through meetings in Bangkok and phone calls between a close-knit group of high-level executives at the competing firms. The close ties and trust among executives, many of whom had previously worked together before moving to competing firms, made discovery of the conspiracy by their customers impossible.

264.   Pretextual and misleading reasons for price increases were included in Conspirators' communications with Plaintiffs about Packaged Tuna price increases throughout the Relevant Period.

265.   With respect to the 2010 net price increase, Bumble Bee's Lischewski circulated a trade announcement on May 21, 2010, stating that "skipjack pricing volatility" led to "cost increases" that drove tuna wholesale prices upward. He listed as "compounding factors" a three-month ban on FAD fishing imposed in the Western Pacific region and sharp increases in the cost of diesel fuel. Likewise, in its May 10, 2010 list price increase announcement, StarKist attributed the increase to low catch rates, fishery closures, and fuel price escalation.  Again, the existence of a price-fixing conspiracy as a reason for the price increases was not disclosed.

266.   The collusive agreement on the 2010 net price increase was also further concealed by having a key meeting occur outside the official NFI venue at a dinner at Benjamin's Steak House in New York City, where high-level executives could speak on otherwise prohibited topics without fear of detection.

267.   In its March 2011 announcement of a price increase effective in May 2011, StarKist cited increases in "Crude index," "Packaging costs," and "Fish

costs." In its January 2012 announcement of a price increase effective March 2012, StarKist cited increases in the costs of crude oil, metal, and transportation, as well as "Record high fish costs." Chicken of the Sea, in its January 2012 announcement of a price increase effective March 2012, placed the blame on "High fish prices" and "higher raw material costs." Again in its March 30, 2012 announcement to "Our Valued Customers" of another price increase effective July 2012, Bumble Bee cited "global inflation, transportation cost increases stemming from global demand on fossil fuel, and resource materials (most notably on fish)." And StarKist, in its April 2012 announcement to "Our Valued Customers" of a price increase, effective in July 2012, cited "numerous costs increases" and escalating "fish costs" as the reasons for the price increase. These statements were misleading because they failed to disclose the true reason for the increase was Conspirators' illegal agreement.

268. In connection with the 2011-12 price increases discussed above, Chicken of the Sea, StarKist, and Bumble Bee interacted mostly through telephonic communications, emails sent from private accounts with misleading subject lines, or face-to-face meetings, as described above. By these means, Conspirators ensured that a written record of their interactions with each other concerning this price increase was not created. There was no way Plaintiffs could have discovered the existence of these communications any earlier than they did.

269. None of these communications ever mentioned Conspirators' collusion or the fact that, as DOJ's Bill Baer stated in December 2015, their industry was "not functioning competitively."

270. The guilty plea of Kenneth Worsham of Bumble Bee further raises the inference that the conspiracy was affirmatively concealed. Kenneth Worsham is the son of Robert Worsham, who was a pricing consultant for StarKist and, as alleged above, participated in the 2008 agreement to increase list prices for Packaged Tuna. The involvement of both father and son in the collusive activity provided

Conspirators with an avenue to pass competitive information in private with no need to present an explanation for why they were meeting and communicating.

271.   Additionally, Lischewski took steps to conceal his own involvement (as well as Lion Capital and Lion Americas' involvement) in the conspiracy. Although Bumble Bee produced millions of pages of documents to Plaintiffs in this case, crucial e-mails between Lischewski and executives of Lion Capital and Lion Americas were not produced by Bumble Bee, and Plaintiffs did not obtain these documents until they executed a subpoena on Lion Capital.  Upon information and belief, Lischewski deleted these incriminating e-mails in an attempt to thwart Plaintiffs' (and DOJ's) investigation of his unlawful conduct.  Indeed, the Grand Jury investigating the conspiracy indicted Lischewski for his role in that conspiracy and the indictment expressly alleged that he deleted emails to conceal his unlawful conduct.

272.   Plaintiffs could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and secrecy techniques employed by Defendants and their co-Conspirators so as to avoid detection of, and fraudulently conceal, their contract, combination, or conspiracy. The conspiracy was fraudulently concealed by various means and methods, including, but not limited to, secret meetings, misrepresentations to customers, utilization of personal email accounts, and surreptitious communications among themselves and their co-conspirators via telephone and in-person meetings so as to prevent the existence of written records.

273.   Because the alleged conspiracy was affirmatively concealed by Defendants and their co-Conspirators until July 23, 2015, Plaintiffs had no knowledge of it, or any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed.

274.   None of the facts or information available to Plaintiffs prior to July 23, 2015, if investigated with reasonable diligence, could or would have led to the discovery of the conspiracy prior to July 23, 2015.

275.   Conspirators thus actively misled their customers about the price-fixing scheme. Their various justifications for price increases did not disclose that they had agreed among themselves to fix, raise or stabilize the price of Packaged Tuna.  Conspirators' justifications for their price increases were also misleading, to the extent they were true even in part, because they failed to disclose that the price increases in fact resulted from their illegal agreement and conspiracy.

276.   Because the agreement, understanding and conspiracy was kept secret, Plaintiffs were unaware of Defendants' and co-Conspirators unlawful conduct alleged herein, and did not know they were paying artificially high prices for Packaged Tuna during the Relevant Period.

277.   As a result of Defendants' and their co-Conspirators' fraudulent concealment of the price-fixing conspiracy, the running of any statute of limitations is tolled with respect to Plaintiffs' claims of anticompetitive conduct alleged in this Complaint.

## XII.   ADDITIONAL ALLEGATIONS AGAINST DEFENDANTS LION CAPITAL, LION AMERICAS, AND BIG CATCH

### A.   Additional Guilty Pleas

278.   Bumble Bee pled guilty to its role in a conspiracy to fix prices of packaged-seafood products in the United States.  The Department of Justice issued a press release on May 8, 2017 detailing the nature of the plea: "In addition to agreeing to plead guilty, Bumble Bee has agreed to pay a $25 million criminal fine, which will increase to a maximum criminal fine of $81.5 million, payable by a related entity [Big Catch Cayman LP], in the event of a sale of Bumble Bee subject

to certain terms and conditions.  Bumble Bee has also agreed to cooperate with the Antitrust Division's ongoing investigation."[7]

279.   Steve Hodge pled guilty to his role in the price-fixing conspiracy during his tenure at StarKist.  Hodge admitted to (and has been convicted of) price-fixing canned tuna (and other packaged seafood products) in violation of the Sherman Act for the period between at least 2011 until 2013.

## B.   The Lion Entities

280.   Defendant Lion Capital LLP ("Lion Capital") is a British private equity firm specializing in investments in the consumer sector.  Lyndon Lea co-founded the company in 2004.   Lion Capital purchased Bumble Bee in 2010 for approximately $980 Million from Centre Partners Management LLC ("Centre"), a United States-based private equity firm.  According to its website, Lion Capital maintained offices in New York and Los Angeles during a time period covered by the alleged conspiracy.  Lion Capital's Los Angeles office was responsible for overseeing the Bumble Bee investment.  The Lion Capital members in this office included Eric Lindberg, Jeff Chang, and Jacob Capps.  As members of a limited liability partnership incorporated under the laws of the United Kingdom, the conduct of Lindberg, Chang, and Capps are imputed to Lion Capital as a matter of both U.S. and British law.

281.   Defendant Lion Capital (Americas), Inc. ("Lion Americas") is another parent company of Bumble Bee that is identified as such in Bumble Bee's plea agreement.  It is the subsidiary through which Lion Capital operates in the United States.  There is no meaningful distinction between Lion Capital and Lion Americas (together, the "Lion Entities").  Lion Americas is headquartered in the same Los Angeles office as Lion Capital.  In terms of personnel, Lion Americas has significant overlap with Lion Capital.  For example, Lindberg was both a director of Lion

---

[7]    https://www.justice.gov/opa/pr/bumble-bee-agrees-plead-guilty-price-fixing.

Americas and a member at Lion Capital, while Capps was President of Lion Americas and a member at Lion Capital.  In other words, the key executives involved on the Bumble Bee account during the relevant period were concurrently both Lion Americas and Lion Capital directors and officers. During the relevant period, there is no indication that Lindberg, Capps, and Chang ever made any attempt to distinguish their work for Lion Capital versus Lion Americas, such as by identifying that they were appearing at a Bumble Bee Board of Director Meeting as a Lion Capital partner checking on its investment as opposed to as a director of Lion Americas in its management capacity (or vice versa). During the relevant time period, Lindberg, Capps, and Chang never made any distinction between acts they took as Lion Capital members or as Lion Americas executives or directors. Additionally, Lion Americas and Lion Capital use the same website without distinguishing between the two entities.[8]   In 2014, when a Lion Capital brand manager wrote to Lion's Fund III Limited Partners, she identified "Lion Capital" as operating at the Los Angeles office where Lion Americas is headquartered.

282.   Lion Capital and Lion Americas participated in the conspiracy alleged in this Complaint through Lindberg, Chang, and Capps (as well as other employees of both entities), and the actions taken by these individuals in furtherance of the conspiracy (as alleged below) were taken on behalf of both Lion Capital and Lion Americas in their official capacities as senior executives of both entities and as members of Lion Capital.

283.   Although Lindberg, Chang, and Capps were members of Lion Capital and also held titles at Lion Americas, each was unequivocally an employee of Lion Capital.  Indeed, each signed a membership agreement with Lion Capital that vested the managing partner of Lion Capital (Lea) with the ability to "determine the duties, role and obligations of each of the Members from time to time."  The membership

---

[8]     https://www.bloomberg.com/profiles/companies/0058736D:US-lion-capital-americas-inc.

agreement further provided that Lion Capital's members were required to "devote the whole of his time and attention to the performance of his obligations on behalf of [Lion Capital], as required by the [Lea], and shall not engage in any other business activities without the consent of [Lea]." In other words, the membership agreements signed by Lindberg, Chang, and Capps provided that their entire focus must be devoted to the day-to-day responsibilities assigned and directed by Lea.

284. In exchange for performing the duties assigned by Lea, Lion Capital's members received 20 vacation days per year (plus all public holidays), a fixed share of Lion Capital's profits (the percentage amount of which was determined at the discretion of Lea), and also bonuses determined at the sole discretion of Lea. Accordingly, although Lindberg, Chang, and Capps received financial compensation from both Lion Capital and Lion Americas, they had a contractual right to payment from Lion Capital.

285. Although Lea was actively involved in managing Lion Capital's investment in Bumble Bee and attended most Bumble Bee board meetings as a member of its board of directors, he assigned Lindberg to be principally responsible for managing Lion Capital's investment in Bumble Bee, and he assigned Capps and Chang to assist Lindberg. Accordingly, all the conduct detailed in this Complaint undertaken by Lindberg, Chang, and Capps was performed at the direction and under the close supervision of Lea, as part of Lindberg's, Chang's and Capps' duties and responsibilities to Lion Capital.

286. At all times relevant to this Complaint, Lion Americas acted as the agent of Lion Capital. In fact, in filing its Form ADV, the uniform form used by investment advisers to register with the SEC and state securities authorities, Lion Americas answered yes to the question "Do you *control* or are you *controlled* by the related person [Lion Capital LLP]?" (emphasis in original). Also, Lion Capital has asserted that Lion Americas exists to provide investment advice to Lion Capital about its U.S.-based portfolio companies (Bumble Bee included). Accordingly, but

for Lion Americas' existence, Lion Capital would have performed this function itself.

287.   Lion Americas would not exist but for Lion Capital.   Lion Americas exists solely to manage Lion Capital investment vehicles.   Lion Capital wholly owns Lion Americas and they act as a single enterprise: anything Lion Americas does to increase the profitability of Lion Capital's investment companies is designed to serve and increase the investments of Lion Capital.   They thus have a complete unity to interests and common design to serve Lion Capital's business and increase the profitability and returns of Lion Capital's investment vehicles.   Put another way, Lion Capital and Lion Americas have no distinct economic interests; they function as a single economic unit.

288.   Lion Americas also performed additional functions that Lion Capital would have had to perform, but for Lion Americas.   For example, Lion Americas paid salaries to Lion Capital members that Lion Capital contractually owed.   In 2011, for instance, Lion Capital paid $1.465 M and Lion Americas paid $4.427 M in wages to the Lion Capital employees stationed in the United States, including Chang and Capps.   Beginning in 2013, however, despite having at least seven of its 24 members based in the United States, Lion Capital's records indicate that it paid no wages to these employees, relying on Lion Americas to make these payments instead.   Again, notwithstanding the fact that these wages were paid by Lion Americas, the amount paid to each employee was subject to the exclusive discretion of Lea.   This arrangement is particularly striking in the case of Lindberg, who was a director of Lion Americas, but not an officer or employee, as it demonstrates the complete absence of corporate separateness between Lion Americas and Lion Capital.

289.   Additionally, due to Lea's ability to dictate the day-to-day responsibilities of Lion Capital's members, Lion Capital has complete control and discretion over the day-to-day operations of Lion Americas.   For example, Capps –

1  nominally the president of Lion Americas – was subject to the contractual provision
2  that provided Lea the ability to determine Capps' duties and responsibilities.  Lea
3  had the same degree of control over Chang and all other Lion Capital members.

4        290.   Further, Lion Americas was wholly dependent on Lion Capital for
5  funding.  Upon information and belief, Lion Americas had no source of revenue
6  independent of Lion Capital, nor did Lion Americas have any direct, independent
7  affiliation with Lion Capital's investment funds.  Thus, Lion Americas acted
8  entirely at the direction of Lion Capital and was entirely dependent on Lion Capital
9  for funding.

10       291.   Defendant Big Catch Cayman LP aka Lion/Big Catch Cayman LP
11  ("Big Catch") is a holding company that wholly owns Bumble Bee.  Big Catch was
12  established in November 2010, and its principal place of business is c/o Lion Capital
13  (Americas) Inc., 888 7th Avenue, 43rd Floor, New York, N.Y. 10019.  Big Catch is
14  the entity referenced in Bumble Bee's criminal plea agreement as the entity that
15  would receive the proceeds from the sale of Bumble Bee.  Based on this fact, the
16  DOJ required that Big Catch must pay up to $81.5 million in criminal fines in the
17  event that Bumble Bee is sold, in order to prevent Big Catch and its investors
18  (including Lion Capital) from being unjustly enriched from the unlawful conduct
19  committed by Bumble Bee.

20       292.   Big Catch is a shell company and does not engage in any operations
21  separate from those of Lion Capital and Bumble Bee.  Big Catch has no day-to-day
22  activities, does not hold board meetings, has no offices, and has no employees.  Lion
23  Capital's funds are the ultimate owner of Big Catch, and senior Bumble Bee and
24  Lion Capital executives (including Lischewski) also own equity stakes in Big Catch.
25  Thus, Big Catch is controlled entirely by Lion Capital and Lion Capital's executives
26  make any and all decisions for Big Catch.  Big Catch's business is Lion Capital's
27  business, and as a result, there is a unity of interest between Big Catch and Lion
28  Capital.

293.   Additionally, the corporate veil between Big Catch and Lion Capital must be pierced and disregarded in order to prevent fraud and injustice. Big Catch was created by Lion Capital in bad faith, and it exists only to serve as a vehicle both to funnel conspiracy proceeds from Bumble Bee to Lion, and also to attempt to insulate Lion from its involvement in the price-fixing conspiracy alleged in this Complaint.   For example, Lion incentivized and rewarded senior Bumble Bee executives (including Lischewski, Ken Worsham and Cameron) with shares in Big Catch for meeting certain revenue and profit targets.   Lion knew that these targets could not be reached but for Bumble Bee's continued participation in the conspiracy, and deliberately set these targets to incentivize and induce the unlawful actions undertaken by these individuals in furtherance of the conspiracy alleged in this Complaint.

294.   Lion Capital also stripped Bumble Bee (the entity that Big Catch was designed to hold) of its assets in order to minimize the financial risk to Lion Capital and its investors if the conspiracy alleged in this Complaint were uncovered.   In acquiring Bumble Bee, Lion Capital and its investors contributed $300 million towards the purchase that Lion Capital classified this contribution as a loan to Bumble Bee, rather than an equity investment. This allowed Lion Capital to get its investment back if Bumble Bee missed its profitability targets or if the conspiracy were detected.   However, the IRS determined that, based on Bumble Bee's status as a thinly capitalized company, interest payments on this loan could not be deducted by Bumble Bee against its profits.   As a result, in 2011, Lion Capital reclassified its $300 million loan as an equity investment, but also directed Bumble Bee to borrow an additional $150 million against Bumble Bee's assets and distribute the proceeds of this loan to Lion Capital's investors through Big Catch.   Lion Capital took this step so that, if the conspiracy proved successful and Bumble Bee realized Lion's profit targets, Lion Capital would receive a substantial windfall, but that if the conspiracy came to light, Lion Capital's risk of loss would be further minimized.

1  Thus, Lion Capital structured Big Catch to shift the risk of the conspiracy's
2  detection to the victims of the price-fixing conspiracy, while seeking to guarantee
3  Lion Capital and its investors with the conspiracy's financial upside.

4      295.   Accordingly, Big Catch is liable for its role in the conspiracy because
5  it is the alter ego of Lion Capital.

6      296.   Lion Capital, Lion Americas, and Big Catch are all defined as "parent
7  companies" in Bumble Bee's Plea Agreement with the DOJ.  (Lion Capital, through
8  its control of Bumble Bee's board of directors, expressly approved this agreement).
9  Additionally, Bumble Bee is a wholly-owned subsidiary of Big Catch, and Lion
10  Capital maintains equitable ownership of both Bumble Bee and Big Catch.  For
11  example, Lion Capital had the ability to award carried interest in the funds that it
12  managed to both itself and to its members.  Thus, Lion Capital had the ability to
13  transfer the ownership interest held by its funds in Bumble Bee from the fund to
14  either Lion Capital itself, or to a separate company – Lion Capital Carry LP – that
15  held carried interests for the benefit of Lion Capital's members.  Further, Lion
16  Capital held itself out as Bumble Bee's owner during conspiracy meetings, and
17  leveraged its control of Bumble Bee to meet with Dongwon and Thai Union for the
18  purpose of policing the conspiracy and ensuring its effectiveness.

19      297.  As described below, Lion Capital and Lion Americas directly
20  participated in the conspiracy through Lea, Lindberg, Chang, and Capps (as well as
21  other Lion Capital employees).  The conduct of Lindberg, Chang, and Capps is
22  legally imputed to Lion Capital because: (1) as members of a Limited Liability
23  Partnership formed under British law, the actions of Lindberg, Chang, and Capps
24  bind the company as a matter of law; (2) Lindberg, Chang, and Capps are employees
25  of Lion Capital and, because all acts that each committed, as alleged in this
26  Complaint, were within the scope of Lindberg's, Chang's, and Capps' employment
27  for Lion Capital, Lion Capital is vicariously liable for their conduct under the
28  principle of *respondeat superior*; and (3) Lindberg, Chang, and Capps are agents of

Lion Capital because their conduct described in this Complaint was committed with the knowledge and at the direction of Lea (Lion Capital's managing partner). As further detailed below, Lion Capital and Lion America directly participated in the conspiracy by: (1) attending meetings with the owners of COSI (Thai Union) and StarKist (Dongwon) at which Lion Capital and Lion Americas agreed to direct Bumble Bee to continue to fully support the conspiracy's various pricing agreements; and (2) using Lion Capital's control of Bumble Bee to ensure that its promises to Thai Union and Dongwon were met. Big Catch participated in the conspiracy as the alter ego of Lion Capital.

### C. Lion Directly Participated in the Conspiracy

298. The Lion Entities directly participated in the conspiracy alleged in this Complaint and purposefully directed this conduct at the United States (including the forum State). Lion Capital and Lion Americas were aware of the conspiracy, took acts in furtherance of the conspiracy, and accepted the proceeds of Bumble Bee's unlawful conduct.

299. Lion Capital and Lion Americas are sophisticated companies, and during their 2010 due diligence of Bumble Bee in preparation for the acquisition, the Lion Entities had access to both Bumble Bee senior executives and others who were key members of the conspiracy, as well as Bumble Bee financial and other records that revealed the existence of the conspiracy. Upon information and belief, Lion Capital and Lion Americas learned of the ongoing conspiracy from these Bumble Bee individuals or records, or both, prior to Lion Capital's acquisition of Bumble Bee. For example, Lion Capital paid particular attention during its review of Bumble Bee's finances to how Bumble Bee's per-can profit margins had increased since 2006. In response to these queries, Bumble Bee indicated that its profit margins had increased primarily as the result of the 2008 can downsize, as well as pricing actions such as the 2008 list price increase (the 2010 price increase had not yet been implemented when Bumble Bee responded to this query). Because

1   it was clear that these pricing actions had necessitated concerted action by each of

2   the Big 3, and because Lion Capital's due diligence surely also revealed the dire

3   structural economic conditions facing the packaged tuna industry in the United

4   States alleged in Section VII.A. of this Complaint (such as declining demand), it is

5   implausible that Lion Capital – a highly sophisticated investment entity – would not

6   have connected the dots and determined that these successful pricing actions were

7   the result of anything other than collusion.  (This inference is further compelled

8   based on Lion Capital and Lion Americas' openly discussing the conspiracy with

9   Bumble Bee and taking acts in furtherance of the conspiracy even before the

10   acquisition was completed, as described below).

11         300.  It bears noting that later, when the DOJ conducted its due diligence

12   review of Thai Union's announced plan in late 2014 to purchase Bumble Bee from

13   Lion, DOJ discovered by late 2015 that "the parties knew or should have known

14   from the get go – that the [packaged seafood] market is not functioning

15   competitively today…"[9]  (At the time, Thai Union and Bumble Bee called off their

16   deal.)  In other words, a sophisticated entity with non-public access to Bumble Bee's

17   executives (if they were truthful) and records regarding the company's packaged

18   seafood business, pricing and communications with competitors would have

19   discovered reasonably soon, *i.e.*, "from the get go," the existence of the conspiracy.

20   DOJ's statement further supports the reasonable inference that Lion Capital and

21   Lion Americas learned about the ongoing conspiracy during their due diligence of

22   Bumble Bee before the 2010 acquisition.

23         301.  The fact that Lion Capital and Lion Americas learned about the

24   conspiracy and what had gone on before each entity joined the conspiracy in 2010

25   is further supported by the Lion Entities' conduct even before the acquisition of

26   Bumble Bee closed.  For example, before Lion Capital announced its purchase of

27

28           [9]     https://www.justice.gov/opa/pr/chicken-sea-and-bumble-bee-abandon-tuna-merger-after-justice-department-expresses-serious.

Bumble Bee in late 2010, Lion executives began interacting with the owners of COSI and StarKist.  In November 2010, Lindberg told Lischewski that he was going to meet with Chairman Kim of Dongwon, and Thiraphong Chansiri and Han Seng Cheng of Thai Union in separate meetings.  Lischewski encouraged Lindberg to meet with both Dongwon and Thai Union (both of whom were actively participating in the conspiracy).  In preparation for the Dongwon meeting, Lischewski told Lindberg that a "key message is to ensure Dongwon that Lion will support rationale [sic] market behavior by Bumble Bee."  There is no reasonable explanation for Lion Capital, which was going to buy Bumble Bee and become a Dongwon competitor, telling Dongwon that Bumble Bee was going to support "rational[] market behavior" unless Lion Capital knew that the conspiracy existed and was committed to participating in and supporting the conspiracy.  In this instance, the phrase "support rational[] market behavior" mirrored the same entreaties that Bumble Bee was making to StarKist through other employees.  For example, during the same week that Lindberg met with Chairman Kim, Dave Melbourne (Bumble Bee) spoke with Joe Tuza, who complained about Bumble Bee's irrational behavior over the last six months related to various promotions with major retailers.  Tuza indicated to Melbourne that any future price increases were dependent on Bumble Bee ceasing such "irrational" pricing.  (Thai Union has also used similar language in statements to the investment community in order to signal support for the conspiracy to the other Conspirators.).

302. In arranging the meeting, Lindberg explained to Mr. Park and Chairman Kim that he wanted to meet with Dongwon on an "owner to owner" basis. Lindberg's correspondence with Dongwon also makes clear that he believed that any meeting between the competitors in which they discussed a commitment to rational market pricing would violate the U.S. antitrust laws.  Notwithstanding Lischewski's entreaty to Lindberg to discuss exactly this topic, Lindberg informed Dongwon that he did not want an antitrust attorney to attend the meeting.  Lindberg

1   attended this meeting, which occurred on November 15, 2010, in New York City,
2   after reviewing talking points for the meeting with Lea and others at Lion Capital.
3   (Because Lion Americas had no legal ability to direct the conduct of Bumble Bee,
4   other than through Lion Capital, Lindberg was necessarily acting on behalf of Lion
5   Capital at this meeting).

6   303.   In light of Lion Capital and Lion America's thorough review of
7   Bumble Bee and the U.S. packaged tuna market prior to the acquisition, combined
8   with the fact that Lindberg and Lischewski were openly discussing meeting with
9   competitors to discuss pricing even before Lion Capital completed its purchase –
10  meetings that Lindberg believed to violate the antitrust laws – it is apparent that the
11  Lion Entities joined the conspiracy in November 2010 with knowledge of the
12  conspiracy and the price-fixing activities that had gone on before November 2010.
13  Further, it is apparent from Lion Capital and Lion America's subsequent conduct in
14  furtherance of the conspiracy that, when they joined the conspiracy in November
15  2010, they did so with the intent to pursue the same anticompetitive objectives as
16  their co-Conspirators.  In any event, Lion Capital and Lion Americas subsequently
17  participated in the conspiracy after acquiring Bumble Bee.

18  304.   The Lion Entities and Bumble Bee were well matched for purposes of
19  the conspiracy.  After buying Bumble Bee, Lion Capital sought investment grade
20  returns for its investors.  Bumble Bee's ongoing participation in the conspiracy at
21  the time that Lion Capital acquired Bumble Bee provided Lion Capital with the
22  opportunity to realize supra-competitive profits from Bumble Bee's business, which
23  in turn would increase Bumble Bee's apparent market value and eventual sale price.
24  This is just what occurred, as the supra-competitive prices and revenue that the
25  conspiracy delivered to Bumble Bee (before Lion siphoned the money) raised
26  Bumble Bee's apparent market value such that, in late 2014, Thai Union was going
27  to pay $1.51 billion for Bumble Bee after Lion Capital had bought Bumble Bee for
28  $980 million four years earlier.

---

305.   After purchasing Bumble Bee, Lion Capital and Lion Americas team members – including Lea, Lindberg, Chang, and Capps, as well as Todd Bondy of Lion Americas – became intimately familiar with Bumble Bee's business and issues affecting it, including issues like catch rates of albacore and skipjack fish costs and the impacts of those costs on Bumble Bee's pricing.  The Lion Capital and Lion Americas executives regularly reported these facts to investors as part of a periodic portfolio review.

306.   Throughout the conspiracy, Lion Capital and Lion Americas were involved in the day-to-day operations of Bumble Bee.  For example, when Lion Capital announced a potential transaction with Thai Union in 2014, Lea (founder of Lion Capital and an officer of both Lion Capital and Lion Americas)[10] gave a statement about The Lion Entities' role in Bumble Bee's operations from 2010 to 2014: "We are proud to have played a significant role in the evolution of Bumble Bee over the last 4 years and would like to thank our partners, Chris [Lischewski] and the management team, for helping us achieve such a successful return on our investment."  Lion Americas' and Lion Capital's heavy involvement in the daily operations of Bumble Bee was consistent with the Lion Entities' business philosophy of getting "down to a very granular knowledge" of the businesses that Lion owned.

307.   In fact, the Lion Entities' website advertises Lion Capital as a private equity firm that closely manages the business affairs of the companies in which it invests.  The website states that Lion Capital "ensure[s] that [its] companies have the best management talent to execute the vision that we develop in a collaborative partnership" while never forgetting "the responsibility for successful outcomes in

---

[10]     Although Lea is an officer of Lion Americas, Lion Americas has taken the position in this litigation that Mr. Lea is exclusively a Lion Capital employee, and as such, Lion Americas does not have custody or control over Lea's custodial files. Lion Americas has not taken this position with respect to Lindberg, who was also a director of Lion Americas (without holding any other title).

---

our companies rests with us [Lion Capital]." Lea echoed this sentiment in an interview on the website: "If all they [companies Lion Capital acquires] want is a check, there are plenty of private equity firms that are delighted to write you a check and let you get on with your business. That's not us…We're not good at that. What we're good at doing is being your partner." Further, a video on the Lion Entities' website states that: "We [Lion Capital] built a team with an intimate knowledge of the way consumers and brands interact, allowing us to work with companies in a very different way to the average private equity firm…We work closely with management to see exactly what a brand is capable of achieving, and then take it to new heights…. We focus solely on retail and consumer businesses so our team is uniquely positioned to work with management to identify the right strategies for revitalizing operations."

308. Consistent with the Lion Entities' business philosophy and website, when Lion Capital first acquired Bumble Bee, Lion Capital and Lion Americas took various actions to ensure that they could monitor and control Bumble Bee's business. As Lischewski told his employees in an internal memorandum at the time of the acquisition of Bumble Bee, the Lion Entities team planned to be "actively involved" with the business. Lion Capital implemented this strategy of active involvement when it acquired Bumble Bee and thereafter during the conspiracy. For example: First, Lion Capital placed its own executives on Bumble Bee's board and throughout its parent companies. Lion Capital executives Lea, Lindberg, and Capps, sat on Bumble Bee's board. Currently, three of the four board members of Bumble Bee are Lion Capital executives. Second, Lion Capital and Lion Americas entered into a management agreement with Bumble Bee in which the Lion Entities agreed to provide "advisory services" to Bumble Bee in exchange for an ongoing "monitoring fee" of 1.25% of Bumble Bee's budgeted EBITDA for each fiscal year, paid quarterly. The agreement also gave Lion Capital "an advisory fee equal to 1.5% of the transaction value" of any equity offering, acquisition, or

recapitalization.  Third, Lion Capital executives Lea, Lindberg, Chang, Capps, and Bondy took an active role in managing and advising Bumble Bee.  At Lion Capital and Lion America's request, Bumble Bee sent these Lion Capital employees daily sales reports, monthly finance reports, and updates on competitors' sales, market share, and supply information.

309.  Lion Capital and Lion Americas executives frequently attended meetings with Lischewski and Bumble Bee's Chief Financial Officer, Kent McNeil.  During these meetings, McNeil would guide the Lion Entities employees through monthly financial reports, page-by-page.   Lion Capital and Lion Americas executives also attended Bumble Bee's quarterly audit meetings.  At these meetings, Cameron and Ken Worsham (both of whom have pled guilty to participating in the conspiracy to fix prices as alleged above) updated Lion Entities executives about Bumble Bee's business and the coordinated and unlawful pricing actions that form the basis of this suit.  Following the board meetings, Lion Capital and Lion Americas executives often met with Bumble Bee management for "executive sessions."  Bumble Bee did not produce minutes of these "executive sessions."

310.  Not only were the Lion Entities regularly receiving information about Bumble Bee during the conspiracy, but the Lion Entities executives took an active role in making decisions about Bumble Bee's operations.  For example, among other things, Lion Capital and Lion Americas executives facilitated and helped oversee "Project Peach," a co-packing venture with COSI.  Lion Capital and Lion Americas executives advised Bumble Bee on public relations issues related to FAD-free fishing, and they directly communicated with third parties on Bumble Bee's behalf regarding sustainability issues.  They even assisted with rolling out a new frozen food line for Bumble Bee.

311.  Upon information and belief, Lea also learned of the conspiracy during his close supervision of Bumble Bee's business, and during his supervision of Lindberg, Chang, and Capps.  This allegation is supported by the fact that Lindberg,

Capps, and Chang frequently reported to Lea, and also by the fact that Lea attended most Bumble Bee board meetings (and received detailed briefings for meetings that he missed). For example, on March 28, 2012, Chang reported to Lea a summary of a Bumble Bee board meeting held the day before.  In his email, Chang referred to non-public information about the profitability of StarKist and COSI, and referenced the fact that, beginning on April 1, 2012, the Big 3 "will be closely aligned on tuna list pricing."   Accordingly, in directing the responsibilities and duties of his employees, Mr. Lea ratified their participation in the conspiracy by continuing to assign Lindberg, Chang, and Capps responsibilities related to Bumble Bee, and determining their compensation based in part on Bumble Bee's financial performance.

312.   Similarly, Lea was actively involved in tracking Lion Capital's valuations of Bumble Bee, so that he could provide investors with details about the value of his funds, and received briefings that reflected his knowledge of the conspiracy.  For example, in July 2012, Lea complained to Lindberg that Bumble Bee had missed the extremely aggressive EBITDA projections set by Lion Capital for the first half of 2012. Lea asked Lindberg to provide any good news that Lea could bring to an upcoming meeting with investors in Lion Capital's fund that would counteract the bad news about Bumble Bee.  Lindberg noted his belief that Bumble Bee's EBITDA target miss would not repeat itself because it was the result of pricing issues "caused by Starkist's dysfunctional management team which was fired by Dongwon," and further responded that the problem was resolved because StarKist and Dongwon "are now in lockstep with us in setting pricing rationally."

313.   Not only were Lion Capital and Lion Americas team members aware of the conspiracy, but they also took affirmative acts to further the conspiracy and pursue its anticompetitive objectives.

314.   For example, as alleged above, in November 2010, Lischewski told Lindberg to convey the "key message" to senior executives of Dongwon (Bumble

Bee's competitor), with whom Lindberg would be meeting, that "Lion will support rational[] market behavior by Bumble Bee," *i.e.*, code for the Lion Entities and Bumble Bee supporting and participating in the conspiracy.

315. Upon information and belief, Lindberg's meetings with Chairman Kim and Thiraphong Chansiri and Han Seng Cheng resulted in the exchange of assurances among each of the owners that their respective U.S. subsidiaries would continue to adhere to the conspiracy pricing agreements. Following the meeting between Chairman Kim and Lindberg, Chairman Kim set a new revenue target for StarKist that was in line with expected proceeds from StarKist following the conspiracy pricing. Additionally, beginning in early 2011, each of the Big 3 began to collude on the promotional pricing that they offered to customers, as alleged in ¶ 240.

316. A few months after his November 2010 meeting with TUG, Lion Capital's Lindberg again met with TUG in January 2011, and they discussed the conspiracy. After this meeting, Lindberg continued to ask Lischewski questions about Bumble Bee's pricing strategy.

317. In the months following Lindberg's meetings, in accordance or consistent with Lindberg's discussions with competitors, the Big 3 agreed to limit promotional pricing to their customers and also agreed to and implemented a collusive price increase in May 2011, as alleged above. In the Fall of 2011, the Defendants and co-Conspirators increased their efforts to police each other's promotional pricing. This served to ensure that each was not only adhering to the collusive list prices, but also refraining from offering promotional discounts that undercut the conspiracy pricing on the back end. For example, in August 2011, Handford (StarKist) contacted Cameron (Bumble Bee) regarding rumors that Bumble Bee was rolling back its price increase. Cameron assured Handford that this was not the case, asking rhetorically, "why the hell would we do this???" Handford forwarded this exchange with Cameron to others at StarKist.

318.   Lion Capital and Lion Americas took an active role in ensuring that the conspiracy agreements were enforced, as Lindberg had assured Dongwon and TUG in their discussions in late 2010.  In order to help ensure that the conspiracy pricing was followed, Lindberg decided to meet with senior executives at Dongwon, and Lindberg informed Lischewski about this meeting.  Lischewski instructed his team to gather information about Bumble Bee's "shares, pricing, base vs promotional activity etc." so that Lindberg could be "briefed on the current competitive situation" for his meeting with Dongwon.  Lindberg ultimately met with senior Dongwon executives in South Korea on October 11, 2011.  Upon information and belief, the purpose of this meeting was for Lindberg to convey, and he did convey, to Dongwon that Bumble Bee was committed to the conspiracy pricing, and at this meeting, Lindberg shared with Dongwon confidential, commercially sensitive information that Lindberg had obtained from Lischewski.  As alleged above, two months after this meeting, the Conspirators had discussions that culminated in another collusive price increase.

319.   Lischewski routinely kept Lion Capital and Lion Americas in the loop and informed about conspiratorial activities.  For example, and without limitation, on a January 16, 2012 telephone call, Lischewski and Bumble Bee's Chief Financial Officer, McNeil, told Chang that StarKist was supposed to announce a list price increase on January 17, 2012, and that Bumble Bee would follow this conspiracy price increase.  Unbeknownst to Lischewski, StarKist had already announced the list price increase on Friday, January 13, 2012.[11]  At the time, Lischewski was aware that an agreement among the competitors to increase prices had been reached and

---

[11]     Lischewski e-mailed Cameron on January 17, 2012 to confirm that StarKist had announced its increase that day.  Cameron informed Lischewski that StarKist had already announced the price increase days earlier, and that Bumble Bee had already announced its own price increase following the StarKist pricing. Cameron already had a copy of StarKist's conspiracy price increase letter and forwarded the letter to Lischewski.

was being implemented. Accordingly, Lischewski conveyed to Chang what he believed was a non-public price increase by StarKist that would occur the next day, along with Bumble Bee's coordinated intention to collusively increase its prices thereafter.

320. The day after Bumble Bee's price increase, on January 18, 2012, Lischewski forwarded to Lindberg, Chang, and Capps the StarKist price increase letter that he obtained from Cameron. One week later, on January 26, 2012, Lischewski forwarded to Lindberg and Capps an e-mail exchange involving K. Worsham and Cameron in which Cameron complained about StarKist personnel not following the pricing tactics that StarKist's "senior leadership" reported to Bumble Bee. In Lischewski's e-mail to Capps and Lindberg, he commented that COSI and StarKist were "cheating" on some first quarter pricing, but hoped that the recently announced collusive price increase would correct the problem by April 1. Through the end of January 2012, Lischewski continued to send Lindberg information (some of it confidential) about StarKist and Dongwon's 2011 performance and 2012 business strategy and pricing of canned tuna, so that Lindberg could help police the conspiracy.

321. On February 3, 2012, per Lischewski's instructions, Lindberg followed up on an e-mail he had received from Thiraphong Chansiri (Thai Union), in which Chansiri asked if Lindberg had any suggestions about how they could "work together on the owner level" to help "improve" the industry. In essence, Chansiri was asking Lindberg how their rival companies could collectively improve pricing of canned tuna. Lindberg replied to Chansiri: "You already know that I agree with your sentiments about the negative industry atmosphere [*i.e.*, deviations from conspiracy pricing], and obviously in the strictest compliance with US law, I am anxious to work with you to improve this sector." As the guilty pleas and COSI's DOJ amnesty described in this pleading indisputably demonstrate, Bumble Bee, COSI, StarKist and the other Conspirators did not conduct themselves "in the

strictest compliance with US law." In particular, and as alleged above, Lion Capital and Lion Americas did not comply with U.S. law. Lion Capital and Lion Americas were aware of and joined the conspiracy in 2010. With regard to the allegations in this paragraph, both Lion Entities knew about and supported the 2012 unlawful agreement, and the Lion Entities, through Lindberg in this instance, reached out to Chansiri with the purpose of making sure that their respective companies would adhere to the conspiracy. Under the facts and circumstances alleged in this pleading, Lindberg's comment to Chansiri about their companies working together to "improve the sector," *i.e.*, under the circumstances, code for increasing prices, "in the strictest compliance with US law" is contrived and by implication reveals that he (and Lion) knew at the time that their involvement in the conspiracy was unlawful conduct under U.S. law. Stated differently, Lindberg's professed statement in his February 3, 2012 e-mail to Chansiri to comply with U.S. law was (and is) instead reflective of his consciousness of guilt from his and the Lion Entities' active participation in the conspiracy.

322. In an effort to help police the conspiracy, Lindberg and Chansiri (Thai Union) met on March 13, 2012 at "O Ya Restaurant" in Boston, using a potential merger of Bumble Bee and COSI as a pretext to meet. Upon information and belief, Lindberg and Chansiri met to discuss the 2012 conspiracy price increase and also the unlawful FAD-Free agreement alleged above. In advance of this meeting, Lischewski discussed these subjects with Lindberg to prepare him for his meeting with Chansiri. In particular, Lischewski told Lindberg that "[Thai Union] needs to show some backbone" in supporting the unlawful FAD-Free agreement, which Thai Union subsequently did.

323. Lindberg and Chansiri (Thai Union) continued to meet from 2012 to 2014 in furtherance of the conspiracy, always under the pretext of "merger" talks between COSI and Bumble Bee. Lindberg always briefed Lea and others at Lion Capital in detail in writing following his meetings with Chansiri, but was also

cautious in these briefings not to reveal in writing any incriminating details from those meetings. For example, following his meeting with Chansiri in Boston on March 13, 2012, Lindberg provided a detailed written description to Lea, Robert Darwent, and others at Lion Capital about the merger discussions that occurred, but also noted that he could only cover additional details verbally or individually (*i.e.*, in person).

324. Against the backdrop of the Lion Entities' involvement in the conspiracy, during 2013-2015, COSI, Bumble Bee, and StarKist continued to engage in frequent communications in furtherance of the conspiracy. The same executives who communicated with each other to reach and police conspiracy agreements on pricing continued to speak regularly by telephone from late 2013 to 2015 for the unlawful purpose of maintaining canned tuna prices at supra-competitive levels. For example, and without limitation:

| DATE | CALLER | RECIPIENT | DURATION |
|---|---|---|---|
| 12.18.13 | Don George (Bumble Bee) | Mike White (Chicken of the Sea) | 11 min |
| 12.18.13 | Mike White | Don George | 10 min |
| 12.19.13 | Steve Hodge (StarKist)) | Mike White | 10 min[12] |
| 12.19.13 | Don George | Mike White | 1 min |
| 12.26.13 | Mike White | Don George | 11 min |
| 1.3.14 | Mike White | Hubert Tucker (StarKist) | 49 min |
| 1.13.14 | Mike White | Hubert Tucker | 7 min |
| 1.16.14 | Don George | Mike White | 5 min |

[12]    Steve Hodge departed StarKist at the end of 2013, and thus this is the last telephone conversation with his co-conspirators in which he was known to participate before leaving the industry.

| DATE | CALLER | RECIPIENT | DURATION |
|---|---|---|---|
| 1.16.14 | Don George | Mike White | 25 min |
| 1.23.14 | Don George | Mike White | 31 min |
| 1.23.14 | Chris Lischewski (Bumble Bee) | David Roszmann (Chicken of the Sea) | 7 min |
| 1.27.14 | Don George | Mike White | 4 min |
| 1.28.14 | Mike White | Don George | 1 min |
| 1.28.14 | Mike White | Don George | 5 min |
| 2.6.14 | Mike White | Don George | 1 min |
| 2.10.14 | Mike White | Don George | 20 min |
| 2.21.14 | Shue Wing Chan (Chicken of the Sea) | Sam Lee (StarKist) | 9 min |
| 3.3.14 | Mike White | Don George | 1 min |
| 3.12.14 | Don George | Mike White | 12 min |
| 3.14.14 | Mike White | Hubert Tucker | 26 min |
| 4.1.14 | Mike White | Hubert Tucker | 23 min |
| 4.17.14 | Mike White | Hubert Tucker | 1 min |
| 4.25.14 | Mike White | Don George | 17 min |
| 5.7.14 | Mike White | Don George | 1 min |
| 5.7.14 | Don George | Mike White | 15 min |
| 5.12.14 | Mike White | Don George | 3 min |
| 5.13.14 | Hubert Tucker | Mike White | 13 min |
| 6.2.14 | Mike White | Hubert Tucker | 24 min |
| 6.26.14 | Mike White | Hubert Tucker | 7 min |
| 7.11.14 | Don George | Mike White | 20 min |
| 8.22.14 | Mike White | Hubert Tucker | 12 min |

| DATE | CALLER | RECIPIENT | DURATION |
|---|---|---|---|
| 8.26.14 | Mike White | Don George | 17 min |
| 9.5.14 | Hubert Tucker | Mike White | 36 min |
| 9.5.14 | Mike White | Hubert Tucker | 1 min |
| 10.7.14 | Hubert Tucker | Mike White | 8 min |
| 10.22.14 | Mike White | Hubert Tucker | 4 min |
| 10.27.14 | Don George | Mike White | 31 min |
| 12.2.14 | Hubert Tucker | Mike White | 12 min |
| 12.9.14 | Mike White | Don George | 8 min |
| 12.15.14 | Don George | Mike White | 21 min |
| 12.20.14 | Don George | Mike White | 8 min |
| 12.22.14 | Mike White | Don George | 18 min |
| 12.22.14 | Mike White | Hubert Tucker | 17 min |
| 12.23.14 | Mike White | Don George | 1 min |
| 12.23.14 | Mike White | Don George | 18 min |
| 12.23.14 | Mike White | Don George | 3 min |
| 12.29.14 | Mike White | Don George | TEXT |
| 12.29.14 | Don George | Mike White | TEXT |
| 12.29.14 | Don George | Mike White | TEXT |
| 12.29.14 | Don George | Mike White | TEXT |
| 1.5.15 | Shue Wing Chan | Chris Lischewski | 1 min |
| 1.6.15 | Shue Wing Chan | Chris Lischewski | 4 min |
| 1.12.15 | Don George | Mike White | 18 min |
| 2.11.15 | Shue Wing Chan | Chris Lischewski | 7 min |
| 2.17.15 | Shue Wing Chan | Don George | 2 min |
| 3.18.15 | Don George | Mike White | 27 min |
| 4.6.15 | Mike White | Hubert Tucker | 42 min |

| DATE | CALLER | RECIPIENT | DURATION |
|------|--------|-----------|----------|
| 7.2.15 | Mike White | Hubert Tucker | 37 min |

325.   Lion Capital and Lion Americas also pushed Lischewski to take steps intended to confirm to StarKist and Dongwon that Bumble Bee was committed to the conspiracy pricing.  For example, on March 30, 2012, Lischewski and Lindberg discussed by e-mail a then-recent article featuring IS Cho of StarKist, in which Cho made comments about and signaled the need for increased pricing.  Lindberg wanted Lischewski to publicly echo Cho's comments (which would reassure StarKist that Bumble Bee was committed to the conspiracy), but Lischewski thought the effort was unnecessary because "[StarKist] already know[s]" that Bumble Bee would adhere to the planned price increase.  Lindberg nevertheless encouraged Lischewski to make a "symbolic" public statement:

> I know we think that they understand that they have been crazy and we have been entirely rational and fair but I bet it isn't quite that clear on their side.  Just a thought, it occurred to me that it might be a good opportunity to start banging a consistent public drum for everyone's consumption that pricing needs to become reasonable. (Emphasis added.)

Lindberg's comments viewed in the context of other facts alleged in this pleading reflect Lion Capital's and Lion America's knowledge of and continued support for the conspiracy, including the Lion Entities' efforts to police the conspiracy pricing.

326.   Lischewski continued to meet with Dongwon's Ingu Park in furtherance of the conspiracy in 2013 and 2014.  For example, in November 2013, Park met with Lischewski at an ISSF meeting in Liverpool, England.  In May 2014, Park e-mailed Thai Union's Chansiri to arrange a private meeting while both executives were in Bangkok between May 19-22 for an industry conference.  During the same industry meeting, Park also met with Lischewski to discuss cooperation between StarKist and Bumble Bee in furtherance of the conspiracy.  Lischewski and

Park met again, on October 21, 2014, at approximately 1:00 a.m., at an unidentified hotel.

327.   Lischewski also continued to have discussions with TUG and COSI executives in furtherance of the conspiracy.  For example, in July 2014, facing declining skipjack and albacore prices that should have resulted in lower canned tuna prices, an e-mail from Lischewski noted that TUG's Han Seng Cheng wanted to keep prices up at current levels.  Lischewski also regularly met with COSI's Chief Operating Officer, David Roszmann.  For example, the two executives met in March of 2014, in Harry's Coffee Shop in La Jolla, and in June 2014, in Coffee Bean & Tea Leaf outlets in San Diego.  In July, the two executives scheduled a meeting for coffee at the Hyatt Regency La Jolla.

328.   In addition to what the Lion Entities team learned in their involvement in Bumble Bee's business, Lischewski served as the Lion Entities' eyes and ears at Bumble Bee, updating Lion Capital and Lion Americas with confidential information about other Conspirators and the status of collusive agreements with and information from Conspirators.

329.   Based on the conspiracy, Thai Union reported in its 2014 annual report, issued in February 2015, that "[d]espite minimal sales growth in the U.S., competitive inventory cost and reasonable market conditions helped lift the margin of our US brand."  Similarly, in December 2014, Lion Capital reported that Bumble Bee's EBITDA was a record-breaking $150 Million, on revenue of $1 Billion.  Lion Capital's Kelly Mayer attributed Bumble Bee's record year to the growth of "gross margins through disciplined pricing actions."  These financial results were due to the conspiracy.  For their part, the Lion Entities knowingly accepted the proceeds of the conspiracy.  For example, in at least some of the years between 2011 and 2014,[13] Lion Capital received payments from Bumble Bee of 1.25% of targeted EBITDA.

---

[13]   This fee appears to have been waived during at least some of those periods.

330. In summary, at the time of its acquisition of Bumble Bee, Lion Capital and Lion Americas knowingly entered the ongoing price-fixing conspiracy with knowledge of its operation and of the collusive conduct that occurred prior to 2010. Following its acquisition in 2010, both Lion Entities affirmatively participated in the conspiracy through 2015 by facilitating coordination and communications with competitors to raise prices and to limit competition.

331. Additionally, Lion Capital continues to maintain equitable ownership of Bumble Bee, which has appreciated substantially since Lion Capital purchased the company for $980 million in 2010. Thai Union had agreed to pay $1.51 billion for Bumble Bee in a deal that was ultimately scuttled due to DOJ's investigation of Conspirators. Accordingly, Lion Capital's equity stake in Bumble Bee has increased by more than $500 million as a result of the conspiracy, even before accounting for the conspiracy profits that have been used to pay down Bumble Bee's debt.

332. Although DOJ scuttled this merger, Lion Capital has already profited from the conspiracy. In March 2011, when Lion Capital and Big Catch directed Bumble Bee to borrow an additional $150 million against Bumble Bee's assets and Lion Capital distributed the proceeds of this loan to its investors (through Big Catch), this allowed Lion Capital to award carried interest in its investment funds to itself and to its members. Further, upon information and belief, Lion Capital has reported to its investors the inflated value of Bumble Bee based on Thai Union's valuation, which reflects a profit of more than $530 million, and a return on Lion Capital's ultimate $150 million investment in excess of 350%.

333. Further, Lion Capital and Lion Americas encouraged Bumble Bee to engage in the conspiracy while (as alleged above) simultaneously loading it up with debt and siphoning off its profits, causing Bumble Bee to become severely overleveraged.

## COUNT I

## VIOLATION OF THE SHERMAN ACT § 1

334. Defendants and their co-Conspirators entered into, and engaged in, a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

335. Defendants and their co-Conspirators' anticompetitive acts were intentional, were directed at the United States Packaged Tuna market, and had a substantial and foreseeable effect on interstate commerce by raising and fixing Packaged Tuna prices throughout the United States.

336. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects upon commerce in the United States and upon import commerce:

a. Prices charged to, and paid by, Plaintiffs for Packaged Tuna were artificially raised, fixed, maintained, or stabilized at supra-competitive levels;

b. Plaintiffs were deprived of the benefits of free, open, and unrestricted competition in the United States Packaged Tuna market; and

c. Competition in establishing the prices paid for Packaged Tuna was unlawfully restrained, suppressed, or eliminated.

337. Defendants' and their co-Conspirators' anticompetitive activities directly and proximately caused injury and harm to Plaintiffs in the United States.

338. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs paid artificially inflated prices for Packaged Tuna.

339. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs were damaged in their businesses or property by paying prices for Packaged Tuna that were higher than they would have been but for Defendants' unlawful conduct, which has resulted in an amount of ascertainable damages to be established at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court:

A.      Adjudge and decree that Defendants' unlawful contract, combination, or conspiracy constituted a per se violation of Section 1 of the Sherman Act;

B.      Enter judgment against Defendants, jointly and severally, in favor of Plaintiffs for treble damages determined to have been sustained by Plaintiffs by virtue of Defendants' and their co-Conspirators' violations of the Sherman Act;

D.      Award Plaintiffs their attorneys' fees, litigation expenses, court costs, and pre-judgment and post-judgment interest at the highest rates permitted by United States law; and

E.      Grant Plaintiffs such other and further relief as the case may require, or as the Court deems just and proper under the circumstances.

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

Dated:  October 31, 2022          **KAPLAN FOX & KILSHEIMER LLP**

By:    /s/ *Laurence D. King*
          Laurence D. King

Laurence D. King (SBN 206423)
1999 Harrison Street, Suite 1560
Oakland, CA 94612
Telephone: (415)772-4700
Facsimile: (415) 772-4707
E-mail: lking@kaplanfox.com

**KAPLAN FOX & KILSHEIMER LLP**
Robert N. Kaplan
Gregory K. Arenson
Elana Katcher
Matthew P. McCahill
850 Third Avenue, 14th Floor
New York, NY 10022

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Telephone: (212) 687-1980
Facsimile: (212) 687-7714
E-mail: rkaplan@kaplanfox.com
E-mail: garenson@kaplanfox.com
E-mail: ekatcher@kaplanfox.com
E-mail: mmccahill@kaplanfox.com

L&G LAW GROUP
Eric R. Lifvendahl
175 W. Jackson Boulevard, Suite 950
Chicago, IL 60604
Telephone: (312) 364-2500
E-mail: elifvendahl@lgcounsel.com

THE COFFMAN LAW FIRM
Richard L. Coffman
3355 West Alabama, Suite 240
Houston, TX 77098
Telephone: (713) 528-6700
E-mail: rcoffman@coffmanlawfirm.com

*Attorneys for Plaintiffs*